**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| | Case No. 19-20905 |
| The Diocese of Rochester, | |
| | Chapter 11 |
| Debtor. | |

| | |
|---|---|
| The Diocese of Rochester, | Adversary Proceeding |
| | No.: 19-ap-02021 |
| Plaintiff, | |
| v. | |
| The Continental Insurance Company, Certain Underwriters at Lloyd's, London, Certain London Market Companies, The Dominion Insurance Company Limited, Stronghold Insurance Company Limited, CX Reinsurance Company Limited, Markel International Insurance Company Limited, Tenecom Limited, National Surety Corporation, Interstate Fire & Casualty Company, Colonial Penn Insurance Company, and HDI Global Specialty SE, | |
| Defendants. | |

### OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT WITH CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, CERTAIN LONDON MARKET COMPANIES, INTERSTATE FIRE & CASUALTY COMPANY AND NATIONAL SURETY CORPORATION

The Official Committee of Unsecured Creditors (the "**Committee**") of The Diocese of

Rochester (the "**Debtor**" or "**Diocese**"), by and through its undersigned counsel, hereby submits

its objection (the "**Objection**")[1] to the *Debtor's Motion for Entry of an Order Approving*

---

[1] The Debtor has failed to provide sufficient evidence in support of the 9019 Motion. Within days of the motion's filing, the Committee propounded document requests on the Debtor and its insurers, wherein the Committee sought

*Settlement Agreement with Certain Underwriters at Lloyd's, London, Certain London Market Companies, Interstate Fire & Casualty Company and National Surety Corporation* (the "**9019 Motion**") [Adv. Pro. Docket No. 99].  In support of its Objection, the Committee respectfully states as follows:

### Preliminary Statement[2]

1.        This case is at a crossroads because the Diocese and its insurers have not offered an appropriate settlement to Sexual Abuse Claimants.[3]  The Diocese entered into a low-value, unacceptable settlement with two insurers, rather than pursue insurance recoveries for the benefit of its victims.  By doing so, the Diocese chose the path of least resistance because it believes that it is easier to obtain approval of the Settlement Agreement rather than seek fair and reasonable value for survivors.  The proposed Settlement Agreement is the first step in an effort by the Diocese to cobble together an inadequate settlement fund and try to cram it down on survivors.  Given the amount of the Diocese's assets, the amount of assets of non-Diocesan codefendants (including many Non-Debtor DOR Entities such as parishes) and the substantial amount of insurance available to fund a settlement, the Committee will vigorously oppose any effort by the Diocese to jam through an inadequate settlement for the sake of expediency.

---

information regarding the Debtor's business judgment and other support for the relief requested.  That discovery is still outstanding.  Prior to the initial hearing on the 9019 Motion, the Diocese led the Committee to believe that the hearing would be a status conference given the discovery and evidentiary issues that need to be addressed. However, one day before the objection deadline, the Debtor informed the Committee that it intended to seek approval of the 9019 Motion at the initial hearing.  The Motion fails as a matter of law.  Nevertheless, notwithstanding the inclusion or omission of any arguments herein, the Committee reserves all rights to raise and argue any other or further arguments in opposition to the 9019 Motion and the Settlement Agreement if and to the extent the Court determines that an evidentiary hearing on the matter is appropriate.

[2] Capitalized terms used in this Preliminary Statement are as defined in the 9019 Motion.

[3] As defined in the *Order Establishing a Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* (the "**Bar Date Order**") [Docket No. 425].

2.     There are myriad technical, evidentiary and legal failings that require denial of the 9019 Motion.  However, fundamentally, the settlement is inequitable.  It is inequitable to survivors because it undervalues their claims.  It is inequitable to the Diocese and its parishes because it leaves them exposed to greater liability by forcing claimants to look to non-insurance assets.  Finally, it is inequitable to the Diocese and its parishes because they will lose the ability to recover defense costs from insurance if claims are ultimately litigated.

3.     There are two issues that must be addressed in order to resolve this Chapter 11 case through a global settlement.  First, the amount of proper compensation for Sexual Abuse Claimants; and, second, what assets are available to fund a settlement.  The value of sexual abuse claims is driven, in large part, by damages that a jury would award a survivor.  Any settlement is based on that potential jury award, and is discounted based on available defenses, time, and other risks.  Based on precedent in many other jurisdictions, it is clear that juries would award substantial amounts of damages to Sexual Abuse Claimants.  Moreover, the best defense typically shielding defendants from liability – the statute of limitations – is not available for cases brought under the CVA.  Settlements or jury verdicts are funded from the defendants' assets, including insurance proceeds.  The Diocese has substantial insurance that can provide hundreds of millions – if not billions – of dollars of coverage for all Sexual Abuse Claims.  Notably, under New York law applicable to the Diocese's insurance policies, abuse stretching across multiple policy years triggers at least one occurrence per policy year.  Thus, where there are millions of dollars of coverage for each occurrence (as there are with the Subject Insurance Policies) and where the policies do not have aggregate limits (as the Subject Insurance Policies do not), there is substantial coverage available for each Sexual Abuse Claim that falls within the policy periods.  Given this favorable insurance landscape, the Diocese should be seeking to

maximize the amount of insurance proceeds available to fund a settlement. Instead, the Diocese entered into the Settlement Agreement.

4.      In order to address the amount of damages juries would award sexual abuse claimants, the Committee has asked the Court to grant stay relief to twenty Sexual Abuse Claimants to move forward with litigation in state court.[4] The sample cases involve different types of acts of abuse and legal questions that are most appropriately addressed by the state courts. The Committee's proposed process carries a risk of ruling(s) unfavorable to survivors, but would provide the best evidence regarding legal liability for various types of claims. In stark contrast, the Settlement Agreement provides wholly inadequate funding based on mere guesswork by the Diocese regarding the value of sexual abuse claims. The Diocese's efforts to end-run survivors by entering into the inadequate Settlement Agreement underscores the need for litigation to move forward.

5.      The Debtor falls far short of the standards governing approval of settlements and sales outside the ordinary course of business, offering no evidentiary support beyond the hearsay and advocacy of the Diocese's coverage counsel. First, the Debtor has not and cannot meet the standards for application of the business judgment rule because the Debtor clearly failed to adequately value Sexual Abuse Claims. Second, the Settlement Agreement is not reasonable on its face given that it provides inadequate compensation for survivors despite coverage amounts that are multiples of the proposed settlement. Third, the proposed settlement dictates plan

---

[4] *Motions for Relief from Automatic Stay* [Docket Nos. 1037, 1039, 1041, 1042, 1045, 1047, 1048, 1049, 1050, 1051, 1052, 1053, 1061, 1063, 1064, 1065, 1070, 1073, 1074 and 1075] (collectively, the "**Motions**") and (b) the Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtor and debtor-in-possession filed its *Joinder of the Official Committee of Unsecured Creditors to Motions for Relief from Automatic Stay* (the "**Joinder**") [Docket No. 1079] and the *Memorandum of Law of the Official Committee of Unsecured Creditors in Support of Joinder and Motions for Relief from the Automatic Stay* ("**Memorandum of Law**") [Docket No. 1081] ("**Motions for Stay Relief**").

treatment for a global restructuring without affording creditors fundamental Bankruptcy Code protections; it is a classic example of a *sub rosa* plan. Given the overwhelming creditor opposition to the settlement, the Debtor could not confirm a plan of reorganization with the settlement at its centerpiece. Instead, the Debtor is using Bankruptcy Rule 9019 to try to sidestep confirmation requirements. <u>Fourth</u>, the Debtor cannot satisfy its burden of proving that the Settlement Agreement benefits the estate or creditors because it relies on mere speculation and conjecture to satisfy this burden. <u>Fifth</u>, the Settlement Agreement has not been signed by more than 115 Non-Debtor DOR entities that are listed as signatories thereto. The Committee has doubts that all such entities participated in negotiation of the Settlement Agreement and understand that they are opening themselves up to substantial liability by waiving insurance rights. <u>Finally</u>, the Diocese clearly ignores its fiduciary duty to its estate and the well-being of its Parishes and the concerns of its parishioners. The Settlement Agreement is wholly inadequate to compensate survivors. Sexual Abuse Claimants and the Committee will expect the Diocese and related entities (including Parishes that are defendants in CVA cases) to fund the substantial shortfall. The Committee is baffled that the Diocese would expose itself and the Non-Debtor DOR Entities to this liability. Based on the fundamental failings of the Settlement Agreement, the Diocese is entering into the agreement solely to expedite a quick settlement that dramatically discounts claims. If the settlement is approved, the Diocese will have one building block for an unconfirmable chapter 11 plan, with a low settlement with its other insurers sure to follow, ultimately topped by a wholly inadequate payment from the Diocese. Sexual Abuse survivors will overwhelmingly vote to reject such a plan, which will be unconfirmable given the improper third-party releases required by the Settlement Agreement. Thus, the Settlement Agreement is the base of a house of cards; it is not the foundation of a proper settlement to resolve this case.

6.      For these reasons and those set forth below, the Court should deny the 9019 Motion.

## OBJECTION

## I.      THE PROPOSED SETTLEMENT IS UNREASONABLE

7.      Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  In determining whether to approve a settlement under Rule 9019, the Second Circuit applies seven factors: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining. *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (internal citations and quotations omitted).

8.      To obtain approval of the Settlement Agreement, the Debtor must demonstrate it satisfies, by a preponderance of the evidence, the requirements imposed by Bankruptcy Rule 9019 and *Iridium*. *See Velde v. First Int'l Bank & Trust (In re Y-Knot Constr., Inc.)*, 369 B.R. 405, 408 (B.A.P. 8th Cir. 2007).  Specifically, "[t]he settling parties must set forth the facts in 'sufficient detail that a reviewing court could distinguish it from mere boilerplate approval of the

trustee's suggestions.'" *In re Lion Capital Grp.*, 49 B.R. 163, 175-76 (Bankr. S.D.N.Y. 1985) (quoting *In the Matter of Boston & Providence Railroad Corp.*, 673 F.2d 11, 12 (1st Cir. 1982)). Based on the record established, the bankruptcy court may then use its discretion to permit a settlement above the lowest level of reasonableness. *Id.* "Approval at that level, however, is not required. The court in applying its discretion is not to act '. . . . arbitrarily or willfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.'" *Id.* (quoting *Langnes v. Green*, 282 U.S. 531, 541 (1931)).

9. The Debtor argues that the *Iridium* factors should be applied to determine "whether the settlement falls below the lowest point in the range of reasonableness." (9019 Motion, ¶ 33). The proposed Settlement Agreement falls well short of any standard of reasonableness and is not "right and equitable under the circumstances and the law" because (1) the Debtor's high likelihood of success in litigation against the insurers does not balance with the significant asset the Diocese is selling, (2) the Settlement Agreement does not avoid the costs and time of litigation, (3) the Settlement Agreement is not in creditors' interest, (4) the Settlement Agreement is subject to the contingency of plan confirmation, and (5) the Settlement Agreement exposes the Diocese and its related entities to litigation risk because Sexual Abuse Claimants and the Committee will look to them to fund the substantial shortfall. Moreover, as discussed in Section III below, because the proposed settlement is a *sub rosa* plan, it must be analyzed under plan confirmation standards, which the Debtor simply cannot meet. Finally, the 9019 Motion also seeks approval under section 363 of the Bankruptcy Code – which requires a finding that the Debtor is exercising its business judgment. As discussed in Section II below, the Debtor fails to meet this standard as well.

**A.    The Diocese Has Substantial Insurance Assets
and a High-Likelihood of Success in the Insurance Litigation**

10.    The LMI/Interstate policies provide massive[5] amounts of coverage for the

Diocese and its related entities.  In particular, from 1978 through 1986, the LMI/Interstate

policies generally provided limits of between approximately $10 million and $25 million **per**

**occurrence**, with no aggregate limit of liability.[6] Moreover, for claims spanning multiple policy

periods, the insurance available for any one claim would likely be *many multiples* of the per-

occurrence limit—not a single per-occurrence limit. *See, e.g., Nat'l Union Fire Ins. Co. of*

*Pittsburgh, PA v. The Roman Catholic Diocese of Brooklyn,* 2017 WL 748834, at *7 (N.Y. Sup.

Ct. Feb. 27, 2017) ("[T]he incidents of abuse suffered by each of the claimants constituted

multiple occurrences and there was at least one 'occurrence' per claimant per policy period

because the injuries suffered by each claimant were unique to that claimant in a given policy year

and caused by separate incidents."); *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire*

*Ins. Co. of Pittsburgh, Pa.*, 21 N.Y.3d 139, 149, 991 N.E.2d 666, 672 (2013) (concluding that a

priest's alleged sexual abuse of the same child taking place over a six-year period constituted

multiple occurrences); *Safeguard Ins. Co. v. Angel Guardian Home*, 946 F. Supp. 221, 231

(E.D.N.Y. 1996) (determining that number of occurrences under liability insurance policies was

equivalent to number of policy periods during which insured's actions led to exposure of the

foster children to the sexually abusive conditions). As a result, even under a conservative

---

[5] Assuming only one occurrence per claim at the $10 million amount for the 144 claims that the Diocese asserts are covered by LMI\Interstate, there would be approximately $1.4 billion of raw coverage available.  The Committee recognizes that it is unlikely that every claim will be awarded $10 million through litigation or settlement, but makes this point to illustrate the magnitude of insurance available.

[6] For the first year of the LMI program period, June 1, 1977 – June 1, 1978, the limits appear lower, but are still significant. As noted above, the limits increase substantially beginning in 1978. Also, during the July 1, 1985 – July 1, 1986 period, one excess policy was issued by Colonial Penn, a non-LMI/Interstate insurer.

analysis of the "number of occurrences" issue, there is still more than enough coverage available to fund an adequate settlement for claims that occurred between 1978 and 1986.[7] Yet, the Diocese wants to settle for only $35 million, less than the amount available to cover a handful of occurrences, much less the approximately 144 to 159 claims covered by the Subject Insurance Policies.

11.     The Diocese tries to justify the settlement by overstating coverage defenses available to LMI\Interstate.  However, the 9019 Motion is bereft of any real discussion of the likelihood that the Debtor will prevail against LMI/Interstate's alleged defenses. That is not surprising because the Diocese has a high likelihood of success against LMI/Interstate in the insurance litigation.  Rather than comprehensively analyze the available coverage and defenses, the 9019 Motion simply presents a list defenses and makes conclusory statements regarding litigation risk.

12.     The Debtor focuses primarily on two purported coverage limitations that it contends justifies settling its insurance claims against LMI/Interstate for a fraction of the available coverage: (1) the contention that the Diocese would have to pay "tens of millions of dollars to satisfy the [self-insured retention (or "SIR")]" under the LMI policies; and (2) the insurers' "expected or intended" defense. 9019 Motion, ¶¶ 24-25.  Neither argument has merit.

13.     <u>First</u>, the Debtor argues that it would "potentially have to pay tens of millions of dollars to satisfy the SIRs."  However, under New York law, an insolvent insured cannot be required to satisfy an SIR as a condition to payment insurance proceeds.  In fact, LMI recently admitted this in the chapter 11 case of the Diocese of Rockville Centre, New York, where it

---

[7] Given this massive number, LMI's position that their liability should be reduced because their subscription to certain policies is "only 80% or 90%" and because there were some insolvent LMI, (*see* 9019 Motion, ¶ 24), does not reduce the available insurance coverage anywhere close to the $35 million settlement amount proposed in the 9019 Motion.

sought to withdraw the reference of an adversary proceeding from the bankruptcy court to the

district court. In doing so, LMI stated that "[t]he LMI Policies include SIRs, but … **LMI cannot**

**require an insolvent debtor to pay its SIRs**." [8] LMI explained further that:

> New York courts hold N.Y. Ins. Law § 3420(a)(1) supersedes the requirement
> that an insured pay its SIRs. *Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275,
> 281 (E.D.N.Y. 2009) ("the failure of a bankrupt to fund a self-insured retention
> does not relieve the insurer of the obligation to pay claims under the policy");
> *Rollo v. Servico New York, Inc.*, 914 N.Y.S.2d 811, 813–14 (N.Y.A.D. 4th 2010)
> (insurer must pay damages for injuries or losses covered under the policy
> exceeding defendants' SIR obligation); *Horsehead Corp. v. Shinski*, 2010 WL
> 1781596, at *4 (N.D.N.Y. Apr. 30, 2010) (holding insurer "is not required to
> cover the SIR").
>
> **Once the Debtor's liability is fixed, LMI must pay valid, covered claims**
> **exceeding the Debtor's SIRs**. Therefore, the "pay first" requirement, which was
> the key factor in *U.S. Lines*, is absent and *U.S. Lines* is inapplicable.

*Id.* at 4 (emphasis added). Thus, per LMI's admission, it cannot require an insolvent debtor to

pay its SIRs, and the assertion that the Diocese would "potentially have to pay tens of millions of

dollars to satisfy the SIRs" is a red-herring. The misplaced conclusions over potential SIR

payments provides no basis to approve the Settlement Agreement.

14.     Second, LMI/Interstate's "expected or intended" defense should be given little, if

any, weight and certainly does not justify the substantial reduction in coverage agreed to by the

Diocese in the 9019 Motion. As an initial matter, there is no basis to support the contention that

the Diocese *intended* or *expected* its parishioners to be sexually abused, assaulted, or to sustain

injury sufficient to defeat insurance coverage.

15.     Indeed, the underlying Child Victims Act ("**CVA**") claims are based in

negligence—*i.e.,* a failure to protect children—not on an intent by the Diocese to harm children.

---

[8] *See The Roman Catholic Diocese of Rockville Centre, New York v. Arrowood Indemnity Company et. al.,* Adv. Pro
No. 20-01227-scc, Docket No. 32, *Reply in Support of LMI's Motion to Withdraw the Reference*, at 6-7 (emphasis
added).

New York law is clear that such allegations are covered. In *RJC Realty Holding Corp. v. Republic Franklin Insurance Co.*, for example, the New York Court of Appeals specifically held that allegations of negligence in hiring or retaining an employee who commits a sexual assault constitute an "occurrence" that is not excluded by an "expected or intended" exclusion. 2 N.Y.3d 158, 164-65 (2004); *see also NYAT Operating Corp. v. GAN National Insurance Co.*, 46 A.D.3d 287, 287 (1st Dept. 2007) ("[B]ecause [policyholder's] liability in the underlying action was based on its negligent hiring and retention of the employee, not respondeat superior, the sexual assault was a covered 'accident' within the meaning of the policy, and the exclusion for injuries expected or intended from the standpoint of the insured does not apply.") (internal citations omitted).

16. Moreover, before an insurer can show that conduct is excluded "intentional conduct," it must prove that there was, in fact, intentional conduct committed by the insured. *City of Johnstown, N.Y. v. Bankers Standard Insurance Co.*, 877 F.2d 1146 (2d Cir. 1989) (interpreting New York law). The Second Circuit, applying New York law in *Johnstown*, held that:

> In general, what make injuries or damages expected or intended rather than accidental are *the knowledge and intent of the insured*. It is not enough that an insured was warned that damages might ensue from its actions, or that, once warned, an insured decided to take a calculated risk and proceed as before. Recovery will be barred only if the insured intended the damages, or if it can be said that the damages were, in a broader sense, "intended" by the insured because the insured knew that the damages would flow directly and immediately from its intentional act.

*Id.* at 1150 (citations omitted, emphasis added); *see also Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.,* 882 F.3d 952, 960, 962 (10th Cir. 2018) (quoting *Cont'l Cas. Co. v. Rapid–Am. Corp.*, 80 N.Y.2d 640, 649 (1993)) ("The New York Court of Appeals has held that damages are accidental so long as they are 'unexpected and unintentional'" and New York law construes "expected or

intended" coverage terms "narrowly as barring coverage 'only when the insured intended the damages'"); *Cont'l Ins. Co. v. Colangione*, 484 N.Y.S.2d 929, 931 (3d Dept. 1985) (citations omitted) ("Ordinary negligence does not constitute an intention to cause damage; neither does a calculated risk amount to an expectation of damage. To deny coverage, then, the fact finder must find that the insured intended to cause damage."); *McGroarty v. Great Am. Ins. Co.*, 36 N.Y.2d 358, 363 (1975) ("Certainly one may intend to run a red light, but not intend that the catastrophic result of collision with another car occur. Calculated risks can result in accidents.").

17. Thus, coverage would be excluded only if an insurer demonstrates that the insured **subjectively** intended to cause property damage or bodily injury. *See Agoado Realty Corp. v. United Int'l Ins. Co.,* 95 N.Y.2d 141, 145 (2000)("[I]n deciding whether a loss is the result of an accident, it must be determined, *from the point of view of the insured*, whether the loss was unexpected, unusual and unforeseen.") (emphasis in original); *see also Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co.,* 905 F.3d 84, 93 (2d Cir. 2018) (applying Connecticut law and distinguishing *Diocese of Winona v. Interstate Fire & Casualty Company*, 89 F.3d 1386 (8th Cir. 1996), in which the Eighth Circuit applied an objective standard in accordance with Minnesota law, which the court noted is an "outlier."). The actions of the insured's employees cannot be imputed upon the insured for the purposes of determining whether a given act was expected or intended. *See RJC Realty Holding Corp.*, 2 N.Y.3d at 165 (2004) (holding that a masseur's intention to assault a client could not be attributed to his employer, the insured); *Agoado Realty Corp.*, 95 N.Y.2d at 146 (2000) ("Indeed, although the murder is, for liability purposes, intentional from the standpoint of the assailant, its cause as set forth in the underlying complaint constitutes an accident from the standpoint of the insured, *i.e.*, negligent security."). Notably, "negligence implies an unintentional or unexpected event," and

therefore **allegations of negligence inherently do not fall within expected or intended exclusions**." *See, e.g., Auto. Ins. Co. of Hartford v Cook*, 7 N.Y.3d 131, 138 (2006); *see also Miller v Cont. Ins. Co.*, 40 N.Y.2d 675, 677 (1976) (ruling a heroin overdose an "accident" when no evidence indicated an intent for the injection to have fatal consequences: "'He [may have] used bad judgment, he [may have been] reckless, [but everything points to the fact that] he did not want to bring bereavement and sadness to his mother.'") (citations omitted; alterations in original). Thus, based on the allegations in the underlying CVA actions (which sound in negligence), binding New York law (which requires the insured's subjective intent to cause harm), as well as the facts adduced to date, LMI/Interstate's "expected or intended" defense will fail resoundingly and provides no basis for the 9019 Motion's significant forfeiture of insurance assets.

18.    Given the amount of available insurance under the LMI/Interstate policies and considering the weakness of the coverage defenses put forward by LMI/Interstate and the high likelihood that the Diocese would prevail in the insurance litigation, the 9019 Motion should be denied and the Diocese and its insurers should compensate the survivors appropriately for the terrible injuries that they have suffered.

### B.    The Settlement Agreement Erroneously Assumes That One-Third of Covered Claims Have Little to No Value

19.    The Diocese unquestioningly and erroneously accepts the insurers' contention that approximately one-third of the Sexual Abuse Claims that fall within LMI\Interstate's coverage period are "low- or no- value claims." The most serious of these (affecting the largest number of claims) appear to be assertions that the claims, among other things, (i) were not timely filed; (ii) allege abuse perpetrated by individuals over whom the Diocese does not exercise control; (iii) allege abuse at facilities over which the Diocese does not exercise control; (iv)

allege abuse at churches that are not affiliated with the Diocese or the Catholic Church; and (v) allege abuse by third parties associated with non-Diocesan entities. 9019 Motion, ¶ 20. The assumption that such claims are to be discounted entirely or significantly is without merit. Notably, not a single pleading filed by the Diocese undertakes any attempt to analyze the insurers' contentions and appears to accept them on their face. As discussed below, the insurers' denials of liability do not stand up to scrutiny.

20.     First, even if a claim was not timely filed by the Bar Date (as defined in the Bar Date Order), the survivor can still assert excusable neglect for the late filing. More significantly, where a non-Diocesan insured entity (such as a parish or school) is also named as a defendant, the claim is insured even if the proof of claim form was filed late. Hundreds of survivors have asserted CVA claims in state court against non-Diocesan defendants. Given the fact that the Bar Date does not affect the timeliness of claims against non-Diocesan defendants, this is no basis to discount the claim significantly from an insurance coverage perspective.

21.     Second, the Diocese and the insurers appear to argue that the Diocese is not liable for abuse of minors by members of religious orders operating within the Diocese. This is not correct. The Diocese is liable for abuse of minors by members of Religious Orders operating within the Diocese's territory.[9]

---

[9] The Diocese does not expressly state this in its pleadings. However, it is apparent to the Committee that this is the Diocese's and insurers position when the Diocese states that it is not liable for claims that "allege abuse perpetrated by individuals over whom the Diocese does not exercise control; [or] allege abuse at facilities over which the Diocese does not exercise control." *See Declaration of Catalina Sugayan in Support of* the *Debtor's Motion for Entry of an Order Approving Settlement Agreement with Certain Underwriters at Lloyd's, London, Certain London Market Companies, Interstate Fire & Casualty Company and National Surety Corporation* Docket [No. 1147] at ¶ 18 (LMI disclaims liability for claims that identify "at least one non-Diocesan perpetrator." ). Notably, some of claims listed by LMI, in fact, identify individuals that were employed by the Dicoese or its Parishes as perpetrators of abuse. For example, Claim 67 identifies Tony Reymour, an employee of Holy Name of Jesus Church in Greece, NY, as a perpetrator; Claims 69 and 438 identify James Burke, a parish priest, as a perpetrator; Claim 133 identifies Sr. Janice Nadeau, a teacher and principal at Church of St. Margaret Mary parish school, as a perpetrator; Claim 256 identifies Dr. Laglia, a doctor conducting physicals at Holy Ghost School, as a perpetrator; Claim 328 identifies Sr. Madeline Cox, a teacher at Nativity of the Blessed Virgin Mary School in Brockport, NY as a perpetrator; Claim 398 identifies Robert O'Neill, a parosh priest, as a perpetrator of abuse. The balance of the claims cited by LMI's

22. The Diocese is liable to childhood victims of sexual abuse because the Diocese was negligent where there was a "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Solomon v. City of New York, 66 NY2d 1026, 1027 (1985); see Davis v. South Nassau Communities Hosp.,* 26 NY3d 563 (2015); *Tenuto v. Lederle Lab.*, 90 NY2d 606 (1997); *Doe v. Diocese of Rockville Ctr.,* 2020 NY Misc. LEXIS 1964 at *21, Index No. 900010/2019, Dkt. No. 145 at 16 (Nassau County) (May 11, 2020) (holding CVA plaintiff adequately plead negligent supervision claim against diocese); *Gallagher-Smith v. Diocese of Rockville Centre*, Index No. 611155/2019, Dkt. No. 74 at 16 (Nassau County) (entered May 19, 2020). The Diocese can be liable for exposing a minor to a dangerous person, even if the person is not its employee or agent. *See Robinson v. Reed-Prentice Div. of Package Mach. Co*., 49 NY2d 471, 484, 403 NE2d 440 [1980] (citing Restatement (Second) of Torts § 302B (1965) favorably). As stated in Comment to Restatement (Second) of Torts § 302B (1965), this rule reflects that there are "situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise…where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account." For example, liability may exist "[w]here the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct." *Id.* Similarly, liability may exist "[w]here the actor has taken charge or assumed control of a person whom he knows to be peculiarly likely to inflict intentional harm upon others." *Id.*

---

counsel identify perpetrators of abuse at Bishop Kearney High School; McQuade High School; Nazareth Hall; the Aquinas Institute; Notre Dame High School; and Cardinal Mooney High School. None of these schools can operate within the Diocese without the Bishop's permission. No priest can provide ministry at these schools without the Bishop granting them faculties. The Diocese is responsible to assure that students of these schools are not abused.

23.     In addition, the Diocese can be held vicariously liable for the acts and omissions of its employees and/or agents who failed to protect minors from being sexually abused by members of religious orders. *See Kenneth R. v R.C. Diocese of Brooklyn*, 229 AD2d 159, 160-61 [2d Dept 1997] (Second Department concluded the defendants could be held directly liable if they knew or should have known that the priest posed a danger to children).  Certain members of Religious Orders were acting as employees or agents of the Diocese or Non-Debtor DOR Entities.  An employer can be held liable under theories of negligent hiring, negligent retention, and negligent supervision, even where the employer is not vicariously liable.  *Id*. (citing *Hall v. Smathers*, 240 NY 486; Restatement (Second) of Torts § 317). The Court noted that "[r]eligious entities have some duty to prevent injuries inflicted by persons in their employ whom they have reason to believe will engage in injurious conduct …" *Id.* at 165.[10]

24.     New York law is clear that the Diocese had a duty to protect the minors from foreseeable harm when there was a minor in its care, custody, or control, regardless of whether the person who sexually abused the minor was one of its employees or agents.  For example, in *Garcia v City of New York*, 222 A.D.2d 192, 195 (1996), a jury found in favor of a kindergarten student who was sent to the bathroom alone and unsupervised, where she was then sexually assaulted by another student. The Court of Appeals held that liability can attach where the school was aware of the generalized risk of sexual assault to "unescorted students" under the school's care. *Id*. at 197. Given the plaintiff presented evidence that the school had security guidelines that acknowledged the danger, and the school's principal was aware of the danger, the Court concluded a "jury could reasonably have come to the conclusion that the danger of the assault which occurred was foreseeable and preventable by proper supervision." *Id*.

---

[10] These issues are case-specific, and cannot be discounted wholesale by the insurers and the Diocese.  Does the Diocese seriously contend that the Diocese or other insured parties (e.g., a parish) is not liable for abuse by a member of a Religious Order employed by and abusing children in a Parish school?

Case 2-19-02021-PRW,   Doc 136,   Filed 07/06/21,   Entered 07/06/21 13:41:29,
Description: Main Document  , Page 16 of 34

25.     Similarly, in *Logan v City of New York*, 148 A.D.2d 167 (1989), a student was raped in a school stairway after being sent, alone, to a classroom two floors above without supervision. Refusing to dismiss the plaintiff's claims, the court held that it could not be found that the defendant acted as a reasonably prudent parent would under the circumstances. To the contrary, the Court concluded the strict security measures implemented by the school indicated an awareness by the school that a child was at risk of attack if left unescorted. *Id*. at 171-72. The Court held that the question was "whether the [defendant] had notice, actual or constructive, that a child was at risk of attack if left unescorted to travel the stairwells of this school at a time other than the scheduled change-of-class intervals." *Id.* There are a myriad of relationships between dioceses and religious orders that are fact specific. Given that there has been no formal discovery of these issues at depth, there is a likelihood that evidence of employer-employee, principal-agent or other relationships will emerge regarding the control of the Diocese over religious orders and their members within the Diocese.

26.     In sum, under New York law, parishes and other insureds are liable for abuse perpetrated by their employees or agents. As insured entities, LMI/Interstate indemnify claims involving employees or agents of the parishes even if they are not employees or agents of the Diocese. In addition, given the Diocese's liability on account of religious order members and institutions operating in the Diocese, the Court cannot accept the Diocese's conclusory position that such claims have little to no value.[11]

---

[11] There are different relationships that the Diocese has with Religious orders. For example, religious order priests clearly operated in churches and parishes of the Diocese. *See, e.g.*, https://www.democratandchronicle.com/story/news/local/rocroots/2015/01/23/whatever-happened-st-patricks/22177125/ (last visited July 2, 2021). Certain parish schools within the Diocese appear to have been staffed by members of religious orders. In addition, the Diocese allows schools operated by religious order to operate within the Diocese and at this time promotes those schools on its website. *See, e.g.*, https://www.dorschools.org/our-schools (last visited July 2, 2021). Before the Court can accept any assertion that the Diocese is not liable for abuse at these schools, it must consider the facts regarding the relationships between them and the Diocese.

Case 2-19-02021-PRW    Doc 136    Filed 07/06/21    Entered 07/06/21 13:41:29,
Description: Main Document  , Page 17 of 34

27.     Thus, the Diocese is clearly wrong in asserting that many claims have little to no value.

**C.     The Settlement Agreement Provides No Tangible Benefit for the Estate**

28.     In exchange for its fire-sale of substantial insurance assets and adding the significant additional burden such disposition places on the estate and Non-Debtor DOR Entities, the Settlement Agreement does not provide the estate with any tangible benefit.  The Debtor repeatedly cites to the avoidance of expensive and protracted litigation in the insurance coverage Adversary Proceeding, but the Settlement Agreement does not actually resolve the coverage litigation. Critically, the number of proofs of claim that implicate policies sold by The Continental Insurance Company ("**CNA**"), a different insurer, is more than twice the number of claims that implicate the LMI/Interstate policies.  Many claims are insured by both CNA and LMI/Interstate.  The Debtor does not – and, indeed, cannot – support its assertion that dismissing the LMI/Interstate defendants will have any significant impact on the coverage litigation's ultimate cost or the time it will take to resolve the litigation, given that the substantial claims against the other major insurer in this dispute remain pending.  The Diocese seems to believe that approval of the Settlement Agreement will cause a domino effect of settlement with its remaining insurer.  This is at best wishful thinking unless the Diocese plans to entice a future settlement by showing that it is willing to settle for pennies on the dollar.  The Committee will continue to oppose unjust and inadequate settlements.[12]

29.     Notably, precedent indicates that settlements with one insurer do not quickly lead to settlements with other insurers.  For example, in the Diocese of Duluth chapter 11

---

[12] CNA has reserved all rights regarding the proposed Settlement Agreement and the number of claims that it is liable for.  See Docket No. 1150.  Thus, the desire to entice CNA with an undervalued Settlement Agreement may be wishful thinking.

case, in November and December 2017 the Diocese of Duluth, its parishes, and the committee entered into **consensual** settlements with certain insurers that provided immediate funds for the estate and were not contingent on a confirmed plan. *See In Re Diocese of Duluth,* Case No. 15-50792, Docket Nos. 316, 320. Nevertheless, one remaining insurer did not settle until fourteen months later. *See In re Diocese of Duluth,* Case No. 15-50792, Docket No. 370. Similarly, in the Diocese of Winona-Rochester chapter 11 case, the diocese and certain insurers settled and eventually filed a plan based on that settlement. *See In re Diocese of Winona-Rochester*, Case No. 18-33707, Docket No. 241. Five months later, however, a recalcitrant insurer has still not settled, and, in fact, is objecting to the debtor's plan.[13] *See In re Diocese of Winona-Rochester*, Case No. 18-33707, Docket No. 291. In reality, the only impact of the Settlement Agreement is to bind the Diocese to a low-value payment from LMI/Interstate now, leaving all other parties (including the Diocese and its parishes) responsible for making up the difference.

**D.    The Paramount Interest of Creditors Demands Denial of the 9019 Motion**

30.    The Court should reject the Settlement Agreement because unsecured creditors—the parties who will ultimately receive the settlement funds—uniformly oppose it. "Unsecured creditors are not voluntary investors in the Debtor and their position on the settlement . . . **is entitled to substantial weigh**t." *In re Exide Techs.*, 303 B.R. 48, 70 (Bankr. D. Del. 2003) (emphasis added); *see also In re Matco Elecs. Group, Inc.*, 287 B.R. 68, 77, 79 (Bankr. N.D.N.Y. 2002) (denying Rule 9019 motion based on "serious objections" expressed by unsecured creditors through creditors committee, which had concluded that pursuing adversary proceeding presented best chance for recovery); *Comm. of Unsecured Creditors of Interstate*

---

[13] Given the overlap of counsel, with Blank Rome in the Diocese of Duluth case and the Diocese of Winona-Rochester case (on behalf of the parishes) and Clyde & Co US LLP, Duane Morris LLP, and Moss & Barnett, P.A. in the Diocese of Winona-Rochester case, the Diocese and LMI/Interstate are well aware of this precedent.

*Cigar Co. v. Interstate Cigar Distrib. (In re Interstate Cigar Co.),* 240 B.R. 816, 824-25 (Bankr. E.D.N.Y. 1999) (more harm to debtor's largest unsecured creditor than benefit to bankruptcy estate where settlement amount was significantly below potential recovery in pending litigation, and party with most to lose from proposed settlement, debtor's largest unsecured creditor, strongly opposed it). Balanced against the strong opposition of the real parties in interest, the support of a debtor looking for a quick and cheap exit from bankruptcy is entitled to significantly less weight.

31. As discussed above, the Settlement Agreement significantly undervalues the Subject Insurance Policies and results in an unreasonably low per claim payment. The only benefit to creditors the Debtor could cite is the undervalued settlement amount, which creditors do not receive until a plan is eventually confirmed, and the "advancement" of the case. *See* 9019 Motion, ¶ 46. As also previously discussed, there is no indication the Settlement Agreement represents the first domino, after which subsequent agreements and a plan will quickly follow. Therefore, the Settlement Agreement does not expedite payment to creditors or alleviate the fact that survivors are aging and, in some instances, passing away while this case languishes. The Settlement Agreement should not be approved because it is contrary to the paramount interests of creditors.

**E.** **The Committee and Its Constituents Do No Support the Settlement**

32. The Committee represents the interests of Sexual Abuse Claimants. The Committee, more than the Diocese, has first-hand knowledge of the cost to survivors of seeking appropriate justice for the abuse they suffered as children. The Committee does not support the settlement. Moreover, state court counsel representing Committee members also represent approximately seventy percent (70%) of all Sexual Abuse Claimants. They too do not support

the settlement. The group that should be the ultimate beneficiary of insurance proceeds rejects the Settlement Agreement. As discussed below in Section III, the Debtor cannot confirm a plan with broad third-party releases without overwhelming creditor support.

**F.     The Nature and Breadth of Releases to be Obtained by
        Related Entities is Inappropriate and Cannot be Approved in a Vacuum**

33.     The Settlement Agreement is predicated on confirmation of a plan that will grant a discharge to the Diocese, along with releases to the related entities such as parishes and other entities responsible for sexual abuse of children. The Settlement Agreement provides that there will be a contribution made by those entities in exchange for such releases. Clearly, any such contribution is a material term of the settlement. Yet, it is undisclosed or, more likely, not yet determined. The Court cannot approve a settlement that does not disclose a material term. The scope of releases granted to affiliates of the Debtor is too broad given the low amount of the settlement and the lack of disclosure of any additional contribution. As discussed below in Section III, the Debtor cannot confirm a plan with broad third-party releases without overwhelming creditor support.

**G.     It is Not Clear that the Settlement is the Product of Arm's Length Bargaining**

34.     As noted, parishes and other entities receive benefits under the Settlement Agreement and are purported signatories thereto. However, there more than 115 such entities that have not signed the Settlement Agreement. *See* Settlement Agreement, 9019 Motion, Ex. A at pgs 46-153 (as numbered by the ECF system). Did all these entities participate in negotiating the Settlement Agreement? Did all these entities agree to fund a further contribution in exchange for releases under a plan? Did all these entities adequately assess the risk that they would be asked to fund the difference between an inadequate settlement and a proper one? The

Committee will explore this issue through discovery.[14]

## II. THE DEBTOR HAS NOT PROPERLY EXERCISED ITS BUSINESS JUDGMENT PURSUANT TO SECTION 363 OR OTHERWISE

35. The Debtor acknowledges that a sale of the Subject Insurance Policies is only appropriate if the Court finds that the transaction represents a reasonable exercise of business judgment on the part of the debtor. Motion, ¶ 59 (citing *In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp (In re Lionel Corp.)*, 772 F.2d 1063, 1071 (2d Cir. 1983). However, the Debtor fails to show that it satisfied the requirement of the business judgment rule in entering into the Settlement Agreement. "The business judgment rule's presumption shields corporate decision makers and their decisions from judicial second-guessing only when the following elements are present: (i) a business decision, (ii) disinterestedness, (iii) due care, (iv) good faith, and (v) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (emphasis added).

36. The Debtor presents three arguments to support its contention that it satisfies the business judgment rule. First, that the estate will receive $35 million. This argument fails because the $35 million is inadequate. Selling an asset for a fraction of its value is not an exercise of business judgment. The Diocese has presented no admissible evidence regarding the value of abuse claims and the value of the Subject Insurance Agreements. Second, that the insurers' ability to pay claims could decrease over time. This is rank speculation. The Diocese and LMI/Interstate have provided no financial information to back up this claim. Third,

---

[14] The Committee is also concerned that each of these entities may not have been represented by counsel when the Settlement Agreement was negotiated. The Committee does not question that the Diocese and the insurers were represented by competent counsel – perhaps the only *Iridium* factor the Diocese meets – the Committee questions whether the non-diocesan entities that did not sign the Settlement Agreement were represented or, even participated, in negotiating the agreement.

that coverage litigation carries risk, involves delay and will have a cost. The Committee addressed this issue above. The coverage Adversary Proceeding must still proceed against CNA. Thus, there is no meaningful cost savings. And the Diocese overstates the risk of litigation.

37.     The Debtor failed to exercise due care with respect to the proposed settlement. Indeed, the 9019 Motion speaks only of the Debtor's **beliefs** concerning the alleged benefits of the agreement and the values of potential claims, but provides no indication – much less evidence – that the Debtor actually analyzed the basis of those beliefs. Critically, the 9019 Motion contains **no discussion** of the appropriateness of the value of Sexual Abuse Claims under the Settlement Agreement.

38.     The Diocese admitted at the outset of the case that it has no in-house expertise for valuing sexual abuse claims. *See* **Exhibit A** hereto (341 Transcript, 28:20–21) (testimony of the Diocese's CFO regarding the amount of the Diocese's liabilities: "I don't know how to quantify the claims. In excess of a hundred million.").[15] The Diocese has presented the Court with no evidence justifying that it exercised its business judgment by agreeing to the Settlement Agreement nor that the Settlement Agreement is within the range of reasonableness.

39.     Prior to entering into the Settlement Agreement, neither the Diocese nor the insurers retained an expert to value the Sexual Abuse Claims. The Diocese and LMI/Interstate are now seeking to retain an expert, presumably to *ex post facto* justify the number already selected by the parties in the Settlement Agreement. *See Motion of London Market Insurers and Interstate Fire & Casualty Company for an Order Permitting (I) the Filing of Pleadings Containing Certain Information and; (II) Permitting Movants to Provide the Abuse*

---

[15] Notably, this testimony was provided well before the Bar Date, when only 73 claims were asserted against the Diocese. *See Affidavit of Lisa M. Passero Regardng the Debtor's Assets and Operations in Support of the Chapter 11 Petition and First Day Pleadings* at ¶ 21 [Docket No. 6].

Case 2-19-02021-PRW,   Doc 136,   Filed 07/06/21,   Entered 07/06/21 13:41:29,
Description: Main Document  , Page 23 of 34

*Survivors' Proofs of Claim to an Expert Witness* [Docket No. 1096]. Clearly, the insurers are attempting to create a post-hoc justification for a settlement they deem favorable. The Committee has also retained a valuation expert, and is supporting a stay relief process that will shed light on the value of Sexual Abuse Claims.

40. The fact that the parties are retaining experts in order to litigate the value of a Sexual Abuse Claim indicates that the Diocese had no basis to form a business judgment that the Settlement Agreement is appropriate.

41. Moreover, the Diocese acknowledges in the Settlement Agreement that it will have to provide additional compensation for Sexual Abuse Claims. By entering into the Settlement Agreement, the Diocese is exposing itself (and its related entities) to funding the shortfall between an appropriate global settlement and the $35 million to be paid by LMI\Interstate. Unless the Diocese has funding commitments to make up this shortfall, it is not properly exercising its business judgment by exposing itself (and its parishes and other entities) to fund the shortfall.

42. Notably, the only support for granting the Motion is the declaration of the Diocese's coverage lawyer, James Murray. Mr. Murray's declaration is full of hearsay. *See, e.g.* Motion , ¶¶ 9 & 10 ("The LMI/Interstate Insurers argue….The LMI/Interstate Insurers contend…."). On top of hearsay is piled speculation. *See, e.g.*, Motion, ¶¶ 11 & 12 ("At trial, the LMI/Interstate Insurers may have attempted to take the position….The LMI/Interstate Insurers' ability to pay claims could decrease…."). Based on the hearsay and his own speculation, Murray provides his mere personal belief that the $35 million settlement is within the range of reasonableness and instructs the Court to approve the Settlement. *See* Motion, ¶ 15. The

Settlement requires more evidentiary support than the testimony of the lawyer that negotiated the Settlement Agreement.

43.     As discussed above in Section I.B., the Diocese also accepts at face value that it has little to no liability for approximately one-third of the claims covered by LMI/Interstate.  Thus, it appears to discount these claims to, at best, a *de minimis* amount.  The Diocese is recklessly gambling that it does not have such liability.  If it is wrong, it will have waived millions of dollars of coverage (even at the deflated amounts of the Settlement Agreement) that it will be liable to pay.  That reckless behavior falls far short of the business judgment standard.

## III.     THE PROPOSED SETTLEMENT IS A *SUB ROSA* PLAN

44.     "A settlement which has the effect of dictating the terms of the debtor's plan of reorganization prior to the confirmation process cannot be approved." *Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in Possession (In re Tower Auto. Inc.)*, 241 F.R.D. 162, 168-169 (S.D.N.Y. 2006) (*citing In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa . . . ."); *In re Iridium*, 2005 U.S. Dist. LEXIS 5483, 2005 WL 756900 at *7 ("the trustee is not authorized to enter into a settlement if it results into a de facto or sub rosa plan of reorganization."); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 887 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted.")).  A settlement that restricts creditors' rights to vote dictates the terms of a plan.  *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 355 (5th Cir. 1997).

45.     The Settlement Agreement is a *sub rosa* plan.  It dictates numerous terms of a plan of reorganization and bypasses creditors' rights to vote on those terms.  Indeed, if the Debtor were to include the Settlement Agreement in a plan, that plan could not be confirmed.  The Committee expects that general unsecured creditors would vote resoundingly to reject such a plan.

46.     Additionally, the 9019 Motion contains no meaningful disclosure – much less adequate disclosure – regarding the value of the Subject Insurance Policies.  The Debtor cannot disregard its statutory disclosure obligations under the guise of Rule 9019.[16]  The massive impact of the settlement on the Debtor, its affiliates, and any plan process clearly indicates that the Settlement Agreement is a *sub rosa* plan.

47.     Further, the Settlement Agreement is conditioned on a plan that requires third-party releases in favor of not just LMI/Interstate, but also over a hundred parishes and related Catholic entities.  9019 Motion, ¶ 29.  The Diocese conveniently omits in the 9019 Motion the importance of the affected creditors' consent in granting third-party releases.  *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141-42 (2d Cir. 2005) (ruling that nondebtor releases may "be tolerated if the affected creditors consent," but such releases should be the exception rather than the rule); *see also In re Dreier LLP*, 2010 WL 1707737 (Bankr. S.D.N.Y. Apr 28, 2010) (noting that the Second Circuit is skeptical about third party releases); *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994) (ruling that creditor support for proposed releases is considered the "single most important factor").  Consistent with

---

[16]     These were the same risks of which the Fifth Circuit warned when it observed: "if a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), creditor's rights under, for example, 11 U.S.C. §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) might become meaningless.  Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposal were first raised in the reorganization plan." *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc.* (*In re Continental Air Lines, Inc.*), 780 F.2d 1223, 1227-28 (5th Cir. 1986).

this view, many courts have expressly premised their approval of third-party releases on the affirmative acceptance of affected creditors. *See, e.g., Matter of Specialty Equip. Co., Inc*., 3 F.3d 1043 (7th Cir. 1993) (allowing release if those creditors who rejected the plan or abstained from voting could still pursue claims against third-parties); *In re Washington Mutual, Inc.*, 442 B.R. 314, 354–55 (D. Del. 2011) ("[T]he court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases."); *In re Digital Impact, Inc*., 223 B.R. 1 (Bankr. N.D. Okla. 1998) (ruling that plan could not be confirmed if any party who would be bound by the release did not vote in favor of the plan); *In re W. Coast Video Enters., Inc*., 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) ("[E]ach creditor bound by the terms of the release must individually affirm same . . . ."); *Ocean Carriers Ltd*., 251 B.R. 31, 43 (D. Del. 2000) (requiring that the affected class accept the plan by at least the percentages required by section 1126 of the Bankruptcy Code); *In re Flintkote Co*., 04-11300 (MFW), 2015 WL 4762580, at *10 (Bankr. D. Del. Aug. 12, 2015) (finding the plan was overwhelmingly accepted when between 94% and 99% of affected creditors voted in favor of the Plan). Here, the Diocese is disenfranchising creditors by seeking Court approval to inextricably bind significant estate assets to releases for insurers and non-debtors without providing those affected creditors an opportunity to vote on those plan conditions.[17]

48.     The Second Circuit also requires that releasees substantially contribute to the estate and for the plan to "otherwise provide[] for the full payment of the enjoined claims." *Metromedia,* 416 F.3d at 142.  The Diocese has not disclosed any contributions the Non-Debtor

---

[17] To the extent the Diocese argues that the plan has not been proposed yet, that distinction is without difference. The Settlement Agreement dictates the terms of the plan.  Indeed, any future litigation or negotiation will be hampered by the terms of the Settlement Agreement if it is approved.

Diocesan Parties will make toward the estate in exchange for their liability releases. To the extent the released parties do not make a meaningful contribution, they will effectively be granted a "gift" by the Debtor. As this Court noted, "Courts faced with so-called 'gifts' to the unsecured creditors class in the context of § 363(b) sales have reached different results about whether such gifts create an impermissible sub rosa plan." *In re Flour City Bagels, LLC*, 557 B.R. 53, 83 (Bankr. W.D.N.Y. 2016). Here, the potential "gift" to parties to be granted releases cannot be approved through a 9019 Motion. The Diocese has not disclosed any contribution it will make to bridge the gap between inadequate Settlement Agreement and a proper settlement with LMI\Interstate. Once again, the Settlement Agreement represents an attempt to bypass the Bankruptcy Code's and Second Circuit's requirements for confirmation of a plan, particularly one that contains third-party releases. The Settlement Agreement is a *sub rosa* plan and should not be approved.

## IV.     THE 9019 MOTION IS PREMATURE

49.     Finally, the Diocese presents no justification for asking the Court to approve the settlement and sale at this juncture of the case. It is unprecedented in a diocesan bankruptcy for the debtor to seek approval of a settlement with an insurer contingent on a not-yet-filed, hypothetical plan of reorganization over the objection of a committee. The reason this has not previously occurred is obvious: to the extent the insurer will not provide funds unless a plan releasing the insurer and all the Diocese's co-insureds from liability is confirmed, the terms and impact of the settlement is hypothetical until such a plan is filed. *See Chafin v. Chafin,* 568 U.S. 165, 172 (2013) (federal courts cannot "give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'")

50.     Among the factors the Second Circuit has instructed bankruptcy courts to

consider while determining whether a debtor has "good business reason" for a sale under section 363 of the Bankruptcy Code, the "most important[]" is "whether the asset is increasing or decreasing in value." *Ind. State Police Pension Tr. v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108, 114 (2d Cir. 2009) (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)).[18]

51. The Diocese has provided no evidence that the Subject Insurance Policies are "decreasing in value." The Diocese has also otherwise failed to justify seeking approval of the Settlement Agreement now, when the money will solely sit in escrow and the parties lack sufficient information to evaluate the settlement in the context of the larger reorganization to which it is contingent. Rather than seeking a premature, advisory ruling from the Court, the Diocese should wait to seek Court approval of the settlement once the other pieces of the plan have been established. Given the conditions built into the Settlement Agreement, there will be no material impact on the case if the Court waits to approve the Settlement Agreement in conjunction with a plan.[19]

## **CONCLUSION**

52. Ultimately, the Diocese has no justification for entering into the Settlement Agreement at this time. The 9019 Motion inappropriately attempts to bypass creditors' rights to disclosure and voting, particularly in relation to the third-party releases

---

[18] The full *Lionel* list is: "the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value." *Lionel*, 722 F.2d at 1071.

[19] Recently, in the chapter 11 case of the Boy Scouts of America, the Debtor had to withdraw an insurance settlement agreement after reaching a settlement with sexual abuse survivors. *See Debtor's Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* at ¶¶ 33-38 [Docket No. 5466], *In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343(LSS) (Bankr. D. Del., July 1, 2021). If the Settlement Agreement is approved and a plan is ultimately rejected, there is a risk that the Diocese will be saddled with the inadequate Settlement Agreement and will be unable to confirm a plan. As such, the Court should deny the 9019 Motion rather than risk additional harm to the Diocese and survivors down the road.

required by the Settlement Agreement.  The Settlement Agreement does not eliminate the expense of litigation.  The Settlement Agreement relinquishes valuable insurance assets, providing discounts for defenses the Diocese could easily overcome. Shockingly, the Settlement Agreement drastically increases the estate's and parishes' exposure and creates "execution risk" that they will have insufficient assets to secure the releases. All in exchange for a contingent payment in the distant future.

53.     The Committee therefore respectfully requests that the Court deny the 9019 Motion.

## **<u>RESERVATION OF RIGHTS</u>**

54.     The Committee reserves the right to make any argument, present any facts, and oppose any argument or evidence with respect to the 9019 Motion.  The 9019 Motion should be denied as a matter of law.  To the extent the Court determines that an evidentiary hearing on the relief requested is necessary, nothing herein shall be deemed a waiver of any rights, claims, actions, defenses or arguments that the Committee may present regarding this matter.

WHEREFORE, for the reasons set forth above and in the Committee's final objection, the Committee respectfully requests that the Court deny the 9019 Motion and grant such other and further relief in favor of the Committee that the Court deems just and proper.

Dated:    July 6, 2021

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

By      */s/ Ilan D. Scharf*
      James I. Stang (admitted *pro hac vice*)
      Ilan D. Scharf
      Iain Nasatir
      James Hunter
      Brittany M. Michael
      780 Third Avenue, 34th Floor
      New York, NY  10017
      Telephone:  (212) 561-7700
      Facsimile:  (212) 561-7777
      Email:    jstang@pszjlaw.com
             ischarf@pszjlaw.com
             inasatir@pszjlaw.com
             jhunter@pszjlaw.com
             bmichael@pszjlaw.com

*Attorneys for the Official Committee of Unsecured Creditors*

**BURNS BOWEN BAIR LLP**

*/s/  Timothy W. Burns*
Timothy W. Burns*
Jesse J. Bair*
One South Pinckney St., Suite 930
Madison, Wisconsin 53703
608-286-2808
tburns@bbblawllp.com
jbair@bbblawllp.com

*Special Insurance Counsel for the Official Committee of Unsecured Creditors*

*Pro Hac Vice Motions to be submitted

DOCS_LA:338769.1 18489/002
Case 2-19-02021-PRW,   Doc 136,   Filed 07/06/21,   Entered 07/06/21 13:41:29,
Description: Main Document  , Page 31 of 34

# **EXHIBIT A**

1      UNITED STATES BANKRUPTCY COURT

2       WESTERN DISTRICT OF NEW YORK

3

4

5

6    In re:

7    The Diocese of Rochester,

8                    Debtor.

9

10   Transcript of Audio File of 341 Meeting

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  other than the debtor?

2      BISHOP MATANO:  No.

3      MS. SCHMITT:  No, okay.  Has the debtor

4  taken out any loans in the last three years?

5      MS. PASSERO:  No.

6      BISHOP MATANO:  No.

7      MS. SCHMITT:  So I'm going to talk briefly

8  about the financial information of the debtor,

9  but these are just going to be kind of

10  overviews.  Can you provide me with an estimate

11  of the debtor's total assets?

12      MS. PASSERO:  68 million, approximately.

13      MS. SCHMITT:  And an estimate of its

14  liabilities?

15      MS. PASSERO:  They are noted on the

16  schedules.  I don't know how to --

17      MR. DONATO:  Do you mind if Lisa looks at

18  the schedules?

19      MS. SCHMITT:  That's fine.

20      MS. PASSERO:  I don't know how to quantify

21  the claims.  In excess of a hundred million.

22      MS. SCHMITT:  Has the debtor loaned money

23  to or repaid loans to officers, directors, or

24  similar titled persons in the last year?

25      MS. PASSERO:  No.