|  |  |
|---|---|
| In re: | Case No.:  19-20905 |
| The Diocese of Rochester, | Chapter 11 |
| Debtor. | |

|  |  |
|---|---|
| The Diocese of Rochester, | |
| Plaintiff, | |
| | Adversary Proceeding No.: 19-ap-02021 |
| v. | |
| The Continental Insurance Company, Certain Underwriters at Lloyd's, London, Certain London Market Companies, The Dominion Insurance Company Limited, Stronghold Insurance Company Limited, CX Reinsurance Company Limited, Markel International Insurance Company Limited, Tenecom Limited, National Surety Corporation, Interstate Fire & Casualty Company, Colonial Penn Insurance Company, and HDI Global Specialty SE, | |
| Defendants. | |

## MOTION TO APPROVE PROPOSED INSURANCE
## SETTLEMENTS TO FUND SURVIVOR COMPENSATION TRUST

The Diocese of Rochester, (the "Diocese"), by and through its undersigned counsel,

hereby moves this Court (this "Motion") for entry of an order, pursuant to sections 105 and 363

of title 11 of the United States Code (11 U.S.C. § 101, *et seq*., as amended, the "Bankruptcy

Code") and Rules 2002(a)(2)-(a)(3), 6004, 9007, 9008, and 9019(a) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") approving negotiated settlements with

(a) certain London Market Companies ("LMI"), (b) certain Underwriters at Lloyd's, London

("Underwriters"), (c) Interstate Fire & Casualty Company and National Surety Corporation ("Interstate"), and (d) Continental Insurance Company and its affiliates ("CNA," and together with LMI, Underwriters, and Interstate, the "Settling Insurers") which will provide aggregate settlement proceeds of $107,750,000 to be combined with an additional $40,500,000 contribution from the Diocese and other DOR Entities (defined below) to make a total of $147,750,000 in funding available for a trust to compensate survivors of abuse. In support of this Motion, the Diocese respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Following extensive negotiations in mediation, the Diocese, together with its parishes and other non-debtor Catholic entities that share insurance coverage with the Diocese (collectively with the Diocese, the "DOR Entities"), have reached agreement, subject to approval by the Court, to resolve all disputes with the Settling Insurers regarding the availability and extent to which any policies of insurance issued by the Settling Insurers (the "Subject Policies") provide coverage for sexual abuse claims asserted against the DOR Entities. In exchange for settlement of the DOR Entities' coverage clams, and to buy back the Subject Policies, the Settling Insurers have agreed to pay an aggregate of $107,250,000 to a survivor trust (the "Trust") to be established pursuant to the Diocese's forthcoming chapter 11 plan of reorganization (the "Plan").[1] The Plan will further provide for the DOR Entities to make an additional contribution of $40,500,000 to the Trust, thereby making a total of $147,750,000 available to satisfy abuse survivor claims.

2.      Last July, the Court denied, without prejudice, a prior motion of the Diocese seeking approval of a $35 million settlement pursuant to which LMI would pay $15 million and

---

[1] The Diocese anticipates that the Plan and accompanying disclosure statement will be filed in the near future.

14010478.8

Interstate would pay $20 million.[2]  At the same hearing the Court also denied multiple motions filed by abuse claimants seeking stay relief to pursue litigation in state court.  In its oral ruling denying both requests, the Court admonished all parties to "wipe the slate clean and participate in the mediation with fresh eyes, fresh attitudes, and minds open to and intent on reaching a global resolution that will form the basis for a consensual chapter 11 plan." *See* Hr'g Tr. 65:22-25, *The Diocese of Rochester v. The Continental Insurance Company Certain Underwriters at Lloyds, et al*., Case No. 19-02021 (Bankr. W.D.N.Y. July 9, 2021) [Adv. Dkt. No. 168].  The Diocese took the Court's words to heart and redoubled its efforts to seek common ground with the Committee and the insurers to establish claim valuations and contributions from both insurance and the DOR Entities that would be reasonable and fair.

3.      The Diocese participated in many mediation sessions and many more informal negotiations with all parties to the mediation.  The mediation allowed all the parties to exchange information and to assess the relative strengths and weaknesses of their respective positions on coverage, claim value, defenses to claims, and other relevant factors.

4.      Before making the decision to settle with the Settling Insurers, the Diocese considered several alternative strategies for monetizing its insurance assets, including moving forward with litigation in the above-captioned adversary proceeding (the "Coverage Action") or assigning its insurance policies to the Trust for post-confirmation coverage litigation.  Ultimately, the Diocese determined that the interests of survivors in this case would be best served by achieving certainty with respect to a very substantial insurance contribution rather than risking the cost, extensive delay, and uncertain outcome of litigation in pursuit of the theoretical possibility of a larger recovery at some point in the distant future.

5.      While the Diocese believes it has strong arguments in support of coverage, the

---

[2] Neither CNA nor Underwriters were included in the prior proposed settlement.

Settling Insurers are likely to raise numerous complex legal and factual issues that would need to be resolved before a court could make a decision on whether the Subject Policies provide coverage, and the extent of such coverage. Even though the Diocese believes it is ultimately likely to prevail, a successful coverage defense asserted by any of the Settling Insurers could significantly hamper the Diocese's ability to compensate survivors. Additionally, while protracted litigation would without question result in increased costs, reducing the funds available for distribution to survivors, there is no guarantee that the result of litigation would be more favorable than the proposed settlement terms.

6. As set forth in the proposed settlement agreements attached to this Motion as **Exhibits A** through **D**, the Settling Insurers have agreed to provide a total of $107,250,000 in funding for the Trust as follows:

| Insurer | Settlement Amount |
|---|---|
| LMI | $16,650,000 |
| Underwriters | $1,100,000 |
| Interstate | $26,000,000 |
| CNA | $63,500,000 |
| **TOTAL** | **$107,750,000** |

These amounts represent an increase from the prior settlement offers from LMI and Interstate of 11% and 30% respectively, and includes an additional $64.6 million in additional recoveries from CNA and Underwriters. When combined with the $40.5 million to be contributed by the DOR Entities pursuant to the Plan, a total of $147,750,000 in funding will be available for the survivor Trust. When evaluated in relation to the approximately 471 unique abuse claims that were timely filed in this Chapter 11 Case, that would allow for an average recovery of more than $300,000 per survivor claim.[3]

---

[3] Earlier this week the Archdiocese of Santa Fe announced that it has received committee consent for a plan providing a settlement fund of $121.5 million to compensate approximately 375 claimants (an average of $324,000 per claimant). The Diocese notes that the proposed insurance settlements and contributions from the DOR Entities

7.     The proposed settlement payments to be received from the Settling Insurers therefore represent a significant step toward funding the Trust and making a meaningful distribution to survivors.  Accordingly, the proposed settlements should be approved.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

9.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The statutory and rule-based predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2)-(a)(3), 6004, 9007, 9008, and 9019(a).

## BACKGROUND

11.     On September 12, 2019 (the "Petition Date"), the Diocese filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Western District of New York (the "Court"), commencing the Diocese's chapter 11 case (this "Chapter 11 Case").  The Diocese continues to operate its business and manage its assets as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     No trustee or examiner has been appointed in this Chapter 11 Case.  On September 26, 2019, the Office of the United States Trustee (the "US Trustee") filed notice of the appointment of an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee").  As of the date of the filing of this Motion, no other official committees have been appointed or designated.

---

in this Chapter 11 Case would provide a survivor recovery at a level similar to the agreed settlement in Santa Fe which was recently characterized by *The New York Times* as being "among the largest of its kind involving the Catholic Church in the United States." *See* *https://www.nytimes.com/2022/05/18/us/archdiocese-santa-fe-bankruptcy-settlement.html* (last accessed May 20, 2022).

14010478.8

13. The Diocese was incorporated under New York law on March 11, 1887 and is a legal entity with its own corporate structure and governance separate from the parishes and other Catholic entities under the canonical supervision of the Bishop of Rochester.

14. The Diocese is governed by a Board of Trustees consisting of the Bishop, the Vicar General and the Chancellor of the Diocese. The territory over which the Bishop exercises canonical supervision encompasses the following twelve counties in Western New York: Monroe, Wayne, Yates, Ontario, Cayuga, Seneca, Tompkins, Tioga, Chemung, Schuyler, Livingston, and Steuben. The Bishop of the Diocese is the Most Reverend Salvatore R. Matano. There are currently 86 parishes (each, a "Parish," and collectively, the "Parishes") and approximately 300,000 Catholic individuals residing in the territory of the Diocese.

## THE INSURANCE POLICIES

15. At various times from at least 1943 to the present, in consideration of premiums paid by the Diocese, or other DOR Entities, various insurance companies sold primary general liability insurance policies, as well as certain umbrella and/or excess liability policies (collectively, the "Insurance Policies"), providing coverage for the DOR Entities.

16. In general, the Insurance Policies are liability policies that provide coverage, subject to their terms, conditions, and limitations, for liability claims based on bodily injury, as long as any part of the injury took place, and with regard to certain Insurance Policies a claim was made, during the policy period.

17. From March 1, 1952 to June 1, 1977, the Diocese purchased primary insurance policies from CNA. These policies provide per accident or per occurrence limits of liability increasing from $50,000 in 1952 to $500,000 in 1977. Additionally, the Diocese purchased

excess policies from CNA for the periods from June 1, 1969 to June 1, 1972 and from June 1, 1975 to June 1, 1977. These excess CNA policies provide $3 million per occurrence.

18.     LMI subscribed to certain policies that cover claims that allege abuse between June 1, 1977 and July 1, 1988. Subject to their terms, conditions, and limitations, the LMI policies indemnify the insured for all sums which the insured shall be obligated to pay by reason of liability for damages and expenses on account of personal injury.

19.     The LMI primary policies provide coverage of $125,000 per occurrence in excess of a $75,000 self-insured retention ("SIR") which operates similar to a deductible. LMI also provided excess policies in certain years providing $5 million of coverage in excess of $5 million.

20.     Interstate sold insurance policies providing excess indemnity coverage to the Diocese for policy periods running from September 1, 1978 to July 1, 1986. Subject to their terms, conditions, and limitations, the Interstate policies indemnify the insured for the amount of loss which is in excess of the applicable limits of liability of an underlying insurance policy (which in most cases is an LMI policy). The limits of the Interstate excess policies are $4.8 million per occurrence until the 1985-1986 period, when Interstate policy limits decreased to $800,000 per occurrence. During the July 1983 to 1985 periods, Interstate also provided insurance in excess of the LMI excess policies. The limits of those Interstate policies are $15 million per occurrence in excess of $10 million.

21.     Beginning July 1, 2009, the Diocese purchased claims-made sexual misconduct coverage from Underwriters with a retroactive date of coverage starting June 13, 1988. The primary limit for sexual misconduct in each policy period is $1 million per claim and $2 million in the aggregate. The Diocese also purchased excess policies from Underwriters providing $10

million per claim.  The Underwriters excess policies have a continuity date of July 2009, which applies to $5 million excess of $1 million, and a continuity date of July 2010, which corresponds to $5 million excess of $6 million.

## SURVIVOR CLAIMS

22.     On January 28, 2019, the New York State Legislature passed the Child Victims Act (A.2683/S.2440) (the "CVA").  The legislation was signed by the governor and became law on February 14, 2019.  The CVA modified New York's statute of limitations and created what was initially a one-year "window" during which victims of child sex abuse could commence previously time-barred civil actions.  The legislation was subsequently amended to extend the window for a second year through August 13, 2021.[4]

23.     As a result of the CVA, multiple claims and suits allege that the Diocese and/or DOR Entities are liable for damages stemming from purported negligence in connection with the alleged acts of child sexual abuse ("Survivor Claims").  The Diocese's primary purpose for filing the Chapter 11 Case was to reorganize the Diocese's financial affairs to address, and provide a forum for the equitable and expedient resolution of, Survivor Claims.

24.     On February 25, 2020, this Court entered an Order establishing August 13, 2020 as the deadline for filing all claims, including Survivor Claims, in this Chapter 11 Case [Docket No. 425].  Approximately 513 unique claimants[5] filed proofs of claim asserting Survivor Claims ("POCs"), of which approximately 471 were received timely and 42 were filed after the Court's bar date.  The POCs allege various degrees of abuse by perpetrators alleged to be priests of the Diocese, employees of DOR Entities, clerics and sisters of religious orders, and other third

---

[4] The CVA also extended the statute of limitations for claims that were not time-barred on its date of passage, permitting child victims to commence timely civil actions until they reach 55 years of age.

[5] Some claimants filed multiple proofs of claim.

parties.  The DOR Entities' liability for Survivor Claims is, from a legal perspective, contingent, unliquidated, and disputed.

25.    The table below illustrates the number of timely and late-filed POCs that implicate the policies issued by each of the Settling Insurers:[6]

| Insurer | Timely Filed POCs | Late-Filed POCs |
|---------|-------------------|-----------------|
| LMI | 159 | 14 |
| Interstate | 140 | 12 |
| CNA | 335 | 25 |
| Underwriters | 41 | 7 |

26.    The Diocese has reviewed all POCs that have been filed in this Chapter 11 Case and has determined that approximately one-quarter to one-third allege what insurers are likely to assert would be, from either an insurance recovery and/or legal liability perspective, low- or no-value claims because, among other reasons, they (i) were not timely filed; (ii) allege abuse perpetrated by individuals over whom the Diocese does not exercise control; (iii) allege abuse at facilities over which the Diocese does not exercise control; (iv) allege abuse at churches that are not affiliated with the Diocese or the Catholic Church; (v) allege abuse by third parties associated with non-Diocesan entities; (vi) allege claims where plaintiffs are unlikely to be able to satisfy the requisite burden of proof;  (vii) allege abuse for which liability is questionable or for which potential damages are limited; or (viii) are otherwise susceptible to a speedy dismissal as a matter of law.

## THE COVERAGE ACTION

27.    On November 14, 2019, the Diocese commenced the Coverage Action by filing a Complaint against the Settling Insurers and other insurance carrier defendants for breach of

---

[6] Some POCs implicate multiple policies.  For example, many proofs of claim that implicate LMI primary policies also occur in years where Interstate provided excess coverage.  In other instances, proofs of claim may allege abuse spanning policy years covered by different insurers.

contract and declaratory judgment, seeking a declaration of the rights, duties, and liabilities of the parties pursuant to the terms of their respective policies and damages [Adv. Dkt. No. 1].

28.    On March 10, 2020, the Court entered an *Order Directing Mediation and Appointing Mediator* [Adv. Dkt. No. 39] (the "Mediation Order").  The Mediation Order (i) referred the claims asserted in the Coverage Action to mediation; (ii) appointed the Honorable Gregg W. Zive, United States Bankruptcy Judge, as mediator; and (iii) directed that the Diocese, all insurer defendants, the Committee, counsel for holders of Survivor Claims, and the *ad hoc* committee of Parishes participate in the mediation process.

29.    Beginning in October 2020, the Diocese, the Committee, the Settling Insurers and the other parties to this action participated in more than a dozen days of formal mediation sessions with Judge Zive.  Moreover, the Diocese has engaged in hundreds of informal mediation discussions with the Settling Insurers and the Committee.[7]

## INSURER RESPONSES TO COVERAGE CLAIMS

30.    While mediation has been productive, there remains a significant divergence in the positions of the parties with respect to several issues, including, but not limited to: (i) the legal liability (if any) of the DOR Entities for Survivor Claims, (ii) the valuation of Survivor Claims, and (iii) the Settling Insurers' responsibility to provide coverage for any liability the DOR Entities may have.

31.    The Settling Insurers have acknowledged the relevant policies, but nevertheless asserted numerous coverage defenses.

---

[7] The Diocese has recently become aware of at least one additional policy issued by The Hartford Financial Services Group, Inc. ("Hartford") that appears to provide coverage for a limited period of time beginning June 1, 1978.  The Diocese was previously unaware of this policy, accordingly, Hartford has not been involved in the mediation or settlement discussions to date, but represents a potential source of additional recovery for the Trust.

14010478.8

32.     For example, LMI argued that the Diocese was responsible for paying a SIR with respect to each occurrence.  As the SIR is $75,000 for each occurrence during the periods from June 1, 1977 to July 1, 1986, LMI therefore effectively contended that the Diocese would potentially have to pay tens of millions of dollars to satisfy the SIRs.  LMI also asserted that certain policies effective for the periods from July 1, 1986 to July 1, 1988, which provided claims made coverage, would not be implicated because the claims at issue were not made during those periods and those policies were subject to sexual misconduct exclusions.  In addition, LMI contended that their liability is reduced because they only subscribed to cover 80% or 90% of losses on certain policies, and because certain subscribing LMI responsible for providing coverage are insolvent.  LMI/Interstate also disputed whether certain claims alleged abuse during their policy periods and suggested that a significant number of claims in their periods were of low or no value or were filed after the proof of claim deadline.

33.     LMI also contended that coverage for certain claims was barred in whole or in part by certain terms, conditions, limitations, and exclusions under some or all of their policies. For instance, LMI asserted that the Diocese had the burden of proving, among other things, that the abuse was caused by an "occurrence" under the policies.  According to LMI, certain claims alleged injuries that were not caused by an "occurrence" to the extent the Diocese might have been aware of the alleged perpetrator's propensity for or history of abuse prior to or during the alleged abuse, and failed to take appropriate action in response.

34.     Interstate's policies for the most part provide coverage in excess of LMI primary policies.  Accordingly, Interstate argued that many of the defenses asserted by LMI were equally applicable to Interstate.  Moreover, Interstate argued that many occurrences would not result in losses sufficient to hit Interstate's excess layer of coverage.

35.     CNA has contended that it was not provided with notice of certain claims, or of the occurrence forming the basis of such claims, within a reasonable time period, and therefore asserts a generic "late notice" defense.  CNA has also contended that coverage for certain claims was barred in whole or in part by certain terms, conditions, limitations, and exclusions under some or all the CNA policies.  For instance, CNA asserted that some or all of its policies limit coverage obligations to those caused by an "accident" and that caused "bodily injury."  According to CNA, certain claims alleged injuries that may not be "bodily injuries."  CNA has also asserted that the Diocese may have had prior knowledge of the proclivities of alleged perpetrator(s) and that certain occurrences therefore were not the result of an "accident."  CNA also disputed whether certain claims alleged abuse during its policy periods or named particular non-debtor entities as insureds or additional insureds.

36.     Underwriters have also contended that coverage might not be available based upon assertions that claims were known to the Diocese prior to the inception of the applicable policies, assertions that claims involve conduct by a perpetrator where the Diocese had notice of the propensity for abuse, and assertions that certain abuse first occurred prior to the continuity date specified in Underwriters' policies.

37.     The Diocese disputes the legal and factual basis for many of the defenses asserted by the Settling Insurers.  Nevertheless, if the Settling Insurers were to prevail on some or all of their defenses in the Coverage Action it would severely limit their liability to the DOR Entities and could even prevent any recovery in its entirety, consequently shrinking the pool of assets available to satisfy Survivor Claims

## CLAIM VALUATION EXPERT

38.     The Diocese has retained Jessica B. Horewitz, Ph.D. and the firm of Gnarus Advisors LLC ("Gnarus") as its expert to provide claim valuation services with respect to

Survivor Claims. Dr. Horewitz and her team at Gnarus have reviewed the POCs filed in this Chapter 11 Case and have provided the Diocese with an initial indication of Dr. Horewitz's opinion as to the aggregate value of the Survivor Claims. Dr. Horewitz has confirmed that Gnarus' initial analysis supports a valuation range for abuse claims consistent with the level of funding the Diocese intends to propose for the Trust in its Plan. Accordingly, the Diocese respectfully submits that it is exercising sound business judgment by entering into the proposed settlements as a key component of funding the Trust.

## SUMMARY OF THE SETTLEMENT AGREEMENTS[8]

39. The proposed settlement agreements provide for a total of $107,250,000 to fund the Trust to be established pursuant to the Diocese's chapter 11 Plan to satisfy Survivor Claims. The settlement agreements contemplate the following transactions:

a. Subject to the Court's approval of the settlement agreements, the proposal of a Plan (i) that establishes the Trust for the payment of Survivor Claims, and which shall be funded, in part, with settlement payments from the Settling Insurers, and (ii) that provides for an injunction upon confirmation channeling any Survivor Claims against the Subject Policies, the DOR Entities, or the Settling Insurers to the Trust.

b. Subject to confirmation of the Plan, the sale of the Subject Policies to the Settling Insurers in exchange for the payment of the applicable settlement amounts and the exchange of mutual releases between the DOR Entities and the Settling Insurers.

c. To the extent the Settling Insurers or the DOR Entities incur costs in connection with the defense, indemnity, settlement or satisfaction of Survivor Claims asserted against DOR Entities prior to confirmation of the Plan and establishment of the Trust, such costs may be set off

---

[8] The summary contained herein is provided for convenience only and is qualified in its entirety by the provisions of the actual settlement agreements, which are attached as **Exhibits A** through **D** to this Motion. Interested parties should review the attached settlement agreements in their entirety.

14010478.8

against the payments to be made by the Settling Insurers, and settlement proceeds may be used to reimburse the applicable DOR Entities, with any balance remaining used to fund the Trust.

## DISCUSSION

**A. Entering into the settlement agreements is in the best interest of the Diocese's estate.**

### The Court has authority to approve the settlement pursuant to Bankruptcy Rule 9019 and section 105 of the Bankruptcy Code.

40. Bankruptcy Rule 9019 provides, in pertinent part: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Section 105(a) of the Bankruptcy Code further provides: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

41. Settlements and compromises are not only permitted in bankruptcy, they are favored and encouraged because they minimize costs of litigation and further parties' interest in expediting administration of the bankruptcy estate. *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) ("In Chapter 11 bankruptcies, settlements also help clear a path for the efficient administration of the bankrupt estate, including any eventual plan of reorganization.").

42. When deciding whether to approve a proposed settlement, a court must determine whether the proposal is "fair and equitable" and "in the best interests of the estate." *In re Drexel Burnham Lambert Group, Inc.* 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991); *In re Texaco*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

43. A court need not conduct an independent investigation in formulating its opinion as to the reasonableness of a settlement. *In re McCoy*, 496 B.R. 678, 683 (Bankr. E.D.N.Y. 2011) (holding that a court need not rule on disputed issues of fact and law or "conduct a 'mini-

14

trial' on the merits of the underlying litigation."). In fact, the court need only determine whether the settlement "fall[s] below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 613 (2d Cir. 1983) *quoting Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied sub. nom. Benson v. Newman*, 409 U.S. 1039 (1972) (proposed settlement approved where it could not be regarded as below the lowest point in the range of reasonableness); *In re Int'l Distr. Centers, Inc.* 103 B.R. 420, 422-23 (S.D.N.Y. 1989) (affirming bankruptcy court's approval of proposed settlement on ground that settlement met or exceeded lowest standard of reasonableness); *In re Best Products Co., Inc.*, 168 B.R. 35, 50-51 (Bankr. S.D.N.Y. 1994), *appeal dismissed*, 177 B.R. 791 (S.D.N.Y. 1995) *aff'd*, 69 F.3d 26 (2d Cir. 1995).

44.     Although it is the movant's burden to establish that the proposed compromise is fair and equitable and in the best interests of the estate, that "*burden is not high.*" *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008) (emphasis added).

**The Court should approve the proposed settlements.**

45.     Second Circuit precedent suggests the Court should weigh the following factors in determining the reasonableness of a proposed settlement and whether it is fair and equitable:

(a)     the balance between the possible litigation success and the settlement's future benefits;

(b)     the likelihood of complex and protracted litigation and the consequent inconvenience, expense, and delay;

(c)     the interests of creditors, including the relative benefits to each class of creditors and the degree to which they either do not object to or affirmatively support the proposed settlement;

(d)     whether other parties in interest support the settlement;

(e)     the competency and experience of counsel supporting the settlement;

<table>
<tr><td>(f)</td><td>the experience and knowledge of the bankruptcy judge reviewing the settlement;</td></tr>
</table>

(f) the experience and knowledge of the bankruptcy judge reviewing the settlement;

(g) the nature and breadth of releases to be obtained by officers and directors; and

(h) the extent to which the settlement is the product of arm's length bargaining.

*In re Iridium Operating LLC*, 478 F.3d at 465; *In re Daticon, Inc.,* 2006 Bankr. LEXIS 3704 (D. Conn. December 22, 2006) at *52, *citing In re Matco Electronics Group, Inc*., 287 B.R. 68, 75 (Bankr. N.D.N.Y. 2002).

46. Importantly, courts "can give more weight to one or more of the above-referenced factors than to the other factors." *In re DeRosa-Grund*, 567 B.R. 773, 785 (Bankr. S.D. Tex. 2017), *citing In re Bard*, 49 Fed. App'x 528, 532-33 (6th Cir. 2002). Moreover, these factors are not exclusive, a court examining the reasonableness of a compromise may consider "[a]ll other factors bearing on the wisdom of the compromise." *In re Shankman*, 2010 Bankr. LEXIS 619 at *7 (Bankr. S.D. Tex. March 2, 2010); *In re Roqumore*, 393 B.R. 474 at 479.

47. Evaluated against the relevant factors, the Diocese respectfully submits that the proposed settlements should be approved:

(a)     *Possible litigation success and the settlements' future benefits*

48. The Coverage Action remains pending and seeks declaratory relief concerning the Settling Insurers' duties to defend and indemnify the Diocese under the Subject Policies with respect to the Survivor Claims and damages relief for breach of contract based on CNA and LMI/Interstate's failure to defend and indemnify.

49. The Diocese submits that it has satisfied all material obligations on its part under Subject Policies and consequently, the Settling Insurers are obligated to pay in full the expenditures made by the Diocese to defend itself against the Survivor Claims. The Settling

Insurers have generally denied coverage is available under the Subject Policies and opposed the relief requested in the Coverage Action.

50.    The Settling Insurers have raised, through reservation of rights letters and other materials and information exchanged through mediation, numerous and complex legal and factual issues that would need to be resolved before a court could make a decision on whether the Subject Policies provide coverage, and the extent of such coverage, if available. While the Diocese believes it has strong arguments in support of coverage, the Settling Insurers are likely to vigorously pursue the defenses proffered to date and litigation inevitably carries certain risks and inherent delays. The nature of the claims and defenses at issue are such that, even if one assumes a relatively low probability that the Settling Insurers will prevail on their coverage defenses, the effect of a successful defense would be disastrous and could severely reduce the ability of the Diocese and other DOR Entities to compensate survivors. Even if the Diocese is ultimately likely to prevail, there is no guarantee that the result of litigation would be more favorable than the proposed settlement terms. Accordingly, the Diocese respectfully submits that the potential upside of continued litigation at this point is significantly outweighed by the potential downside, especially in light of the substantial settlement offers currently before the Court.

51.    Conversely, if the proposed settlements are approved, they will: (i) provide a concrete financial benefit to the estate, specifically earmarked for Survivor Claims; (ii) eliminate the underlying uncertainty of litigation; and (iii) avoid the expenditure of estate resources on expensive and time-consuming coverage litigation.

52.    The $107,250,000 to be received from the Settling Insurers pursuant to the proposed settlements represents a significant step toward funding the Trust and making a

meaningful distribution to holders of Survivor Claims.  When combined with the additional $40,500,000 contribution contemplated by the DOR Entities, as much as $147,750,000 should be available to fund distributions in satisfaction of allowed Survivor Claims.[9]  Just as importantly, the proposed settlements will advance the Chapter 11 Case toward confirmation by eliminating a significant source of uncertainty surrounding the value of the Diocese's insurance claims, thereby facilitating faster compensation for survivors than could be achieved if the Diocese were to litigate the Coverage Action to its conclusion.

> *(b)*      *The likelihood of complex and protracted litigation*
> *and the consequent inconvenience, expense, and delay*

53.      As discussed in the foregoing paragraphs, if the issues between the Settling Insurers and the Diocese must be litigated, the result will be complex litigation involving federal law, state law, and bankruptcy-specific considerations.  The claims and causes of action asserted in the Coverage Action are multifaceted and many may be matters of first impression in this Court and under New York law.  Any such litigation, including potential appeals, would significantly delay the Diocese's restructuring efforts (and hence, the Diocese's ability to compensate survivors) likely by several years if not decades, and most certainly will burden the Diocese's estate with additional administrative expenses.  *See In re The Roman Catholic Diocese of Syracuse, New York*, 628 B.R. 571, 578 (Bankr. N.D.N.Y. 2021).

54.      In light of the uncertainty surrounding the ultimate outcome of litigation, the certainty of additional delay and costs, the unfortunate fact that some survivors will not live long

---

[9] To the extent Survivor Claims are litigated prior to confirmation of the Plan and establishment of the Trust, the Settling Insurers and/or DOR Entities, including the Diocese and any of its shared insurance participants, may incur costs relating to the defense, settlement or indemnity of such litigation.  The proposed settlements provide for any payments made by the Settling Insurers to be deducted from their settlement payments, and for settlement proceeds to reimburse any costs incurred by the DOR Entities, with any remaining proceeds being used to fund the Trust.  Accordingly, in the event claims against parishes and other DOR Entities are not stayed, defense and indemnity costs could reduce the amount ultimately available to fund the survivor Trust.

enough to benefit from a successful litigation outcome,[10] together with the near certainty that litigation costs would actually reduce the funds available for distribution to survivors, the Diocese submits that this factor strongly favors approval of the proposed settlements with the Settling Insurers.

(c)    *The interest of creditors and their*
       *response to the compromise and settlement*

55.    The proposed settlements are clearly beneficial to creditors. Settlement allows for the payment of a significant sum to the estate for the benefit of survivors, the primary creditor group in this Chapter 11 Case, without incurring additional administrative expenses which will serve only to reduce creditor recovery. The aggregate $107,250,000 in proposed settlement proceeds represents an *insurance-only* contribution of more than $225,000 per Survivor Claim, many of which may be vulnerable to coverage defenses and/or assert claims where the Diocese's liability is questionable at best. These payments will form the basis of the Trust to be established for the benefit of survivors under the Plan. While the Committee has previously argued that "billions" of dollars of insurance coverage should be available, in order to arrive at such an inflated figure the Committee must essentially assume that each and every Survivor Claim (i) is meritorious to begin with, (ii) would prevail at trial based upon available evidence, applicable law, and defenses to liability, (iii) would overcome all of the Settling Insurers' defenses to coverage, and (iv) would result in a verdict approaching the full available per occurrence policy limits. When all relevant risk factors are considered, the Diocese submits that it is a statistical improbability that all of the 471 Survivor Claims would be nearly so successful at trial. More likely, the results would be mixed with some plaintiffs prevailing and securing judgments of varying sizes, while other plaintiffs would fail to meet their burden of proof, or even having

---

[10] Sadly, one member of the Committee has already died during the pendency of this Chapter 11 Case.

obtained a judgment, find themselves frustrated by meritorious insurer defenses to coverage. While it is understandable that certain plaintiffs might be willing to gamble on their own potential outcome in litigation, the Diocese respectfully submits that to do so with respect to the interests of the creditor body as a whole would be irresponsible.

56.     Accordingly, the Diocese believes that the concrete benefit to be obtained through settlement in the form of $107,250,000 in funding for the Trust will directly benefit survivors and is in their best collective interests because it will allow them to be fairly compensated without undue additional delay.

### *(d)     Whether other parties in interest support the settlement*

57.     The non-debtor DOR Entities who are co-insureds with equal rights to coverage under the Subject Policies will be parties to the proposed settlements, and they support using the proceeds of the policy buy-back to satisfy Survivor Claims.  Accordingly, the parties in interest most directly affected by the proposed settlements are in favor of approval.

58.     The Diocese is committed to continuing to work with the Committee and other parties in interest in this Chapter 11 Case to resolve through the mediation process claim-valuation issues necessary to formulate a consensual Plan.  To date, there has been a substantial difference of opinion between the Committee's position and that of the other mediation parties as to the appropriate value to be ascribed to Survivor Claims, and the availability and extent of coverage under the Diocese's insurance policies.  The Diocese believes that the Committee may not support the proposed settlements and instead may argue that the $107,250,000 in aggregate settlement proceeds is insufficient in comparison to amounts the insurers might be required to pay as a result of potentially massive jury verdicts which a few individual plaintiffs might obtain

if allowed to liquidate their claims in state court.[11]  The Diocese is prepared to demonstrate at an evidentiary hearing that, after assessing the countervailing risks and benefits to all parties of further litigation, the proposed settlement proceeds, combined with the additional $40,500,000 to be contributed by the DOR Entities under the Plan, is sufficient and appropriate to adequately and fairly compensate the survivors for their injuries, and that the Diocese's decision in agreeing to settle its coverage claims against the Settling Insurers more than satisfies the reasonableness standard of Bankruptcy Rule 9019 and the business judgment test under section 363 of the Bankruptcy Code.

59.     Moreover, as discussed above, not all factors relevant to a determination under Rule 9019(a) should necessarily be given equal weight, and any consideration of the "judgment value" of Survivor Claims (as compared to settlement value) must take into account the Diocese's own legal and factual defenses in the underlying Survivor Claim litigation.   Any potential litigation over Survivor Claim liability and damages is subject to considerable uncertainty.  Any consideration of the value to be ascribed to Survivor Claims in the context of this settlement, and this Chapter 11 Case generally, should take into account the risk that plaintiffs may not prevail on their Survivor Claims, the delay in getting to trial, that damages may be minimal, that the substantial majority of any liability established must of necessity be allocated to the actual perpetrators who intentionally inflicted abuse as opposed to the negligence of the Diocese, the possibility of post-trial motion practice or appeals, and the fact that the assets of the Diocese available to pay any judgments that might be obtained are finite.  Accordingly, the

---

[11]   The Diocese observes that, outside of bankruptcy, such occasional large verdicts would result in significant disparity in the amount recovered by different abuse survivors, and would favor certain litigants based not necessarily upon the merits of their claims or the severity of their abuse, but upon the timing of their trial and the aggressiveness of their counsel.  The Diocese filed this Chapter 11 Case in large part to avoid just such inequities.

Diocese respectfully submits that the proposed settlements provide a very reasonable compromise that is in the best interest of abuse survivors.

60.     Further, while the Court may consider the perspective of the Committee and individual abuse claimants, the Diocese respectfully submits that neither the claimants nor the Committee has a veto power and the Court can nevertheless approve the proposed settlements over their objections, if any.  *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010) ("[t]here is no *per se* rule that the views of a committee or other creditors are dispositive on the reasonableness of a settlement.  A *per se* rule would unduly expose the Debtors to the demands of creditors preferring to risk estate assets in a litigation lottery or litigate under blackmail or strong-arm strategies") (citing *In re Matco Elecs. Grp., Inc.,* 287 B.R. 68, 77– 79 (Bankr. N.D.N.Y. 2002)); *In re Tower Auto. Inc.*, 241 F.R.D. 162, 172 (S.D.N.Y. 2006) (affirming bankruptcy court's approval of settlements over committee's objection and reasoning that "[d]espite the Committee's contentions, it is in the best interest of all parties to go forward with these Settlements so that the Debtors and the Committee can proceed to negotiate a plan and end to these cases"); *Vaughn v. Drexel Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505–07 (Bankr. S.D.N.Y. 1991) (approving settlement over creditor's committee objection, reasoning that "although [the court] may consider a creditor's objection to the proposed compromise, the objection is not controlling and will not bar approval").

61.     The Diocese respectfully submits that the proposed settlements are fair and reasonable and that their overall benefit to the estate should outweigh any opposition that may be raised.

62.     Each of the Settling Insurers is represented by experienced bankruptcy and insurance coverage counsel.  Many of the attorneys representing the Settling Insurers have represented either the Settling Insurers, or other carriers, in other mass tort cases, including chapter 11 cases involving Catholic dioceses.  The Diocese is also represented by experienced bankruptcy counsel (Bond Schoeneck & King, PLLC) that regularly appears in this Court and is familiar with the bankruptcy issues affecting the settlement, special insurance counsel (Blank Rome LLP) experienced in coverage litigation and complex insurance settlements, including several prior settlements of diocesan insurance claims in bankruptcy, and experienced state court litigation counsel (Harris Beach PLLC) familiar with the merits of the underlying Survivor Claims.  Counsel for all parties involved participated in the negotiations that resulted in the proposed settlements.

(f)     *Experience and knowledge of the bankruptcy court judge*

63.     This Court is unquestionably experienced in evaluating settlements in a bankruptcy context.

(g)     *The nature and breadth of releases to*
        *be obtained by officers and directors*

64.     The releases that the DOR Entities, on the one hand, and the Settling Insurers, on the other hand, are giving and receiving under the proposed settlements are limited solely to claims that impact the Subject Policies and any potential extracontractual allegations that the DOR Entities may have or claim to have against the Settling Insurers based on their conduct with respect to the Subject Policies.

65.     Further, as contemplated by the proposed settlements, the Plan will provide, and the parties will ask the Court to order at confirmation, that all Survivor Claims will be channeled

to the Trust which is being funded, in part, by the $107,250,000 in settlement payments from the Settling Insurers.[12]  This approach is consistent with the manner in which many other diocesan chapter 11 cases involving similar Survivor Claims and insurance issues have been successfully resolved.

66.     As the Court is aware, on December 16, 2021, the United States District Court for the Southern District of New York entered a decision reversing a bankruptcy court order confirming the chapter 11 plan of Purdue Pharma.  *In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021).  The facts in *Purdue* are clearly distinguishable from this case.  In *Purdue* members of the Sackler family were among the primary wrongdoers in facilitating the sale of addictive prescription opioid medications to advance their own pecuniary interests and engaged in a years-long campaign to extract assets from the company and to place them in offshore jurisdictions beyond the reach of creditors.  The Sacklers then insisted on receiving releases in exchange for returning to the estate only a portion of certain assets were very arguably recoverable fraudulent transfers.  Here, in contrast, there is no suggestion that the DOR Entities wrongfully acquired their rights as co-insureds under the Subject Policies (which they are proposing to compromise in exchange for the benefit of a channeling injunction) nor are there any reasonable contentions that any of the DOR Entities specifically acted with malice or an intent to harm survivors.  The claims against the DOR Entities, to the extent they have any merit at all, sound in negligence.  The only intentional tortfeasors – the perpetrators of abuse – will not receive the benefit of any channeling injunction.  Moreover, because the primary responsibility

---

[12] The Diocese notes that, in addition to contributing part of the additional $40.5 in funding for the Trust, the parishes and other DOR Entities will, pursuant to the proposed settlements, release their interests in coverage under the Subject Policies as co-insureds to facilitate the implementation of the settlement and the payment of the settlement proceeds.  By doing so, the DOR Entities are providing a valuable contribution, important to the overall success of the Plan, and thereby giving consideration for any benefit they will receive under a channeling injunction included as part of the Plan and any order confirming the Plan.

for assigning clergy falls to the Diocesan Bishop, any negligence claims against the DOR Entities relating to the placement or oversight of clergy are derivative of their relationship with the Diocese, and *Purdue* expressly recognized that the bankruptcy court "had undoubted authority to release and enjoin" such derivative claims. *Id*. at 91. Lastly, the Diocese notes that the Southern District's decision in *Purdue* is not binding upon this Court, and is currently the subject of an expedited appeal before the United States Court of Appeals for the Second Circuit. In the unlikely event the Court of Appeals reverses decades of prior precedent and holds that bankruptcy courts are not authorized to issue channeling injunctions or confirm plans providing third-party releases outside of the asbestos context, the proposed settlements provide the Diocese with a right to terminate the settlements, restoring the parties to the *status quo ante* with respect to the Coverage Action. Accordingly, the Diocese respectfully submits that *Purdue* should not be an impediment to this Court's approving the proposed settlements as fair, reasonable and in the best interests of the Diocese and survivors.

> (h) *The extent to which the settlement is*
> <u>*the product of arm's length bargaining*</u>

67. The proposed settlements were negotiated at arm's length. The Diocese and each of the Settling Insurers were represented by competent counsel, and the business terms were negotiated not only by counsel, but also by the parties' respective business leaders and representatives, over the course of many formal and informal mediation sessions and many months.

68. Based upon the foregoing, and the testimony and other evidence to be adduced and elicited at an evidentiary hearing, the Diocese respectfully submits that it can satisfy its burden under Bankruptcy Rule 9019(a) and section 105(a) of the Bankruptcy Code to show

reasonableness and requests that the Court enter an order approving the proposed settlement agreements in their entirety.

**B.  The Diocese has articulated a legitimate business reason to implement the proposed settlement by selling the Subject Policies to LMI/Interstate pursuant to section 363(b) of the Bankruptcy Code.**

69.     Section 363(b) of the Bankruptcy Code permits a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate" after notice and a hearing."  11 U.S.C. § 363(b)(1).  A debtor in possession is given these rights by operation of section 1107(a) of the Bankruptcy Code.  *See* 11 U.S.C. §1107(a).  Moreover, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. §105(a).

70.     Courts have uniformly held that approval of a proposed sale of property pursuant to section 363(b) of the Bankruptcy Code is appropriate if a court finds that the transaction represents a reasonable exercise of business judgment on the part of the debtor.  See *e.g., In re Chateaugay Corp.,* 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp (In re Lionel Corp.)*, 772 F.2d 1063, 1071 (2d Cir. 1983); *see also Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992) ("the business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interest of the company") (internal quotations omitted), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993).

71.     Courts generally show great deference to a debtor in possession's decisions when applying the business judgment standard.  *See In re Global Crossing, Ltd.,* 295 B.R. 726, 744

n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a bankruptcy court to substitute its own business judgment for that of the [d]ebtors and its advisors, so long as they have satisfied the requirements articulated in the caselaw."). Deference should be given except in those rare instances where the debtor's business judgment is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043, 1047 (4th Cir. 1985); *see also, In re Integrated Res., Inc.,* 147 B.R. at 656 ("The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.") (internal citations omitted).

72.     There are sound business reasons in support of the proposed settlements. First, the proposed settlements will result in up to $107,250,000 in cash proceeds to fund the Trust for resolution of Survivor Claims. Notably, the combined contributions from LMI and Interstate represent a 25% increase over the prior settlement proposal. Second, the Subject Policies' value, and the ability of some Settling Insurers to pay claims thereunder, could decrease over time. Third, litigation regarding coverage for Survivor Claims carries significant risk and would involve lengthy delays and additional costs. Accordingly, the Diocese has a valid business justification for settling its claims against the Settling Insurers.

## C.     The requirements of Bankruptcy Code section 363(f) are satisfied.

73.     Section 363(f) of the Bankruptcy Code permits debtors, with court approval, and subject to the satisfaction of certain enumerated conditions, to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges and encumbrances attaching to the net proceeds of the sale with the same rights and priorities

therein as in the sold assets). [13]  Section 363(f) is drafted in the disjunctive, meaning the proposed

sale of the Subject Policies back to the Settling Insurers need only satisfy one of the five

statutory requirements.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *Scherer v. Fed.*

*Nat'l Mort. Ass'n (In re Terrace Chalet Apartments, Ltd.)*, 159 B.R. 821, 827 (N.D. Ill. 1993).

74.     Here, the Diocese may implement the proposed settlements by selling the Subject

Policies back to the Settling Insurers free and clear of any claims or other interests – for several

independent reasons:  (i) nonbankruptcy law permits a negotiated settlement "of an insured's

cause of action against its insurer free and clear of any interest of an injured party whose tort

claim would trigger the insurer's duty to defend and indemnify the insured," *see In re Dow*

*Corning Corp.*, 198 B. R. 214, 245 (Bankr. E.D. Mich. 1996); (ii) the only entities with an

undisputed interest in the Subject Policies (the DOR Entities) will consent to the sale; and (iii) to

the extent any plaintiff may assert that they have an interest in the Subject Policies as the holder

of a Survivor Claim, (x) such interest, as well as the underlying Survivor Claim, is subject to a

bona fide dispute and (y) survivors could be compelled to accept a money satisfaction of their

Survivor Claims and their interests (if any) in the Subject Policies.

---

[13]   Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

    (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
    (2)     such entity consents;
    (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
    (4)     such interest is in bona fide dispute; or
    (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

14010478.8

**D. The Settling Insurers are entitled to the protections of Bankruptcy Code section 363(m).**

75. The Bankruptcy Code does not define "good faith purchaser." The Second Circuit, however, has "adopted a traditional equitable definition: 'one who purchases the assets for value, in good faith and without notice of adverse claims.'" *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) quoting *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985). "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Colony Hill Assocs.,* 111 F.3d 269, 276 (2d Cir. 1997) (citation omitted).

76. The proposed settlements are the culmination of multiple mediation sessions, over several months, conducted at arms-length, under the supervision of a well-credentialed, independent mediator, with a national reputation as well as extensive external negotiations. As such, the Settling Insurers are entitled to the protections afforded to a good faith purchaser under Bankruptcy Code section 363(m).

**E. The releases and injunctions contemplated in the settlement agreements are necessary and appropriate.**

77. As a corollary to the Court's power to dispose of assets free and clear of liens and encumbrances, the Court has authority to issue injunctions and releases for the benefit of third parties. *See, e.g., In re Energy Co-op., Inc.*, 886 F.2d 921, 929 (7th Cir. 1989) ("The power of the court under [§ 105(a)] also includes the power to issue an injunction enjoining third parties from pursuing actions which are the exclusive property of the debtor estate and are dismissed pursuant to a settlement agreement"); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89,93 (2d Cir. 1998).

14010478.8

78.     At their core, bankruptcy courts are courts of equity, and a bankruptcy court's "equitable powers are traditionally broad."  *See Airadigm Commc'ns, Inc. v. F.C.C. (In re Airadigm)*, 519 F.3d 640, 657 (7th Cir. 2008) (citing *United States v. Energy Res. Co.,* 495 U.S. 545 (1990)).  Section 105 of the Bankruptcy Code is one of the many mechanisms by which bankruptcy courts are authorized to effectuate their equitable powers.  *Id.* Section 105(a) authorizes a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Section 1123(b)(6) permits a bankruptcy court to "include any other appropriate provision [in a chapter 11 plan] not inconsistent with the applicable provisions of this title."  11 U.S.C. § 1123(b)(6).  This authority "permits [a] bankruptcy court to release third parties from liability to participating creditors if the release is 'appropriate' and not inconsistent with any provision of the bankruptcy code."  *In re Airadigm*, 519 F.3d at 657; *In re Ingersoll, Inc.*, 562 F.3d 856, 864 (7th Cir. 2009) (sections 105(a) and 1123(b)(6) allow bankruptcy courts to release third parties from liability to bankruptcy proceeding creditors).

79.     The Second Circuit and the majority of federal circuits recognize that bankruptcy courts have the authority to issue third party releases and injunctions.  *S.E.C. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285 (2d Cir. 1992); *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 1412 (2d Cir. 2005); *In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir. 1989); *In re Specialty Equip. Cos.,* 3 F.3d 1043, 1047 (7th Cir. 1993).  Furthermore, As discussed in greater detail at paragraph 66 *supra*, the Southern District's decision in *Purdue* is distinguishable on its facts and, at any rate, is not binding on this Court.

14010478.8

**The contemplated releases and proposed injunctions
to be included in the Plan and confirmation order are narrowly tailored.**

80.     A narrowly tailored release covers only claims arising from or related to the bankruptcy case and does not result in a full-fledged "bankruptcy discharge." *See In re Ingersoll,* 562 F.3d at 865.  Here, the releases contemplated in the proposed settlements, and the injunctions contemplated in the Plan and any order confirming the Plan, are appropriately tailored to the facts and circumstances surrounding this Chapter 11 Case and are a critical component of the settlement with the Settling Insurers and the Plan.  Eliminating either would jeopardize the success of this Chapter 11 Case.  In contrast to the broad global release criticized by the Second Circuit in *Metromedia*, the releases contemplated in the proposed settlements relate only to claims that the DOR Entities or the Settling Insurers could assert with respect to the Subject Policies.  Moreover, the injunctions contemplated to be included in the Plan and any order confirming the Plan will channel to the Trust only (i) Survivor Claims and (ii) other causes of action arising under or related to the Diocese's insurance policies, and then only to the extent such claims are asserted against (x) the Diocese, (y) DOR Entities and others who have made a substantial contribution to the Plan (including by contributing to the Trust and settling their rights as co-insureds with the Diocese), or (z) the Settling Insurers and others who subsequently settle their liability with respect to the Diocese's insurance coverage claims.  The injunctions contemplated in the proposed settlements will not provide a global discharge of, or enjoin the prosecution of, other claims that may be brought against the Settling Insurers or the DOR Entities.

81.     Ultimately, the determination of whether the releases and injunctions are permissible is a matter reserved to this Court's discretion.  *See In re Tops Holding II Corp.,* Case No. 18-22279 (RDD) (Bankr. S.D.N.Y. Nov. 8. 2018), Hr'g Tr. 63:18-24 (ECF No. 783)

(finding that the court had core jurisdiction to consider whether to approve third-party releases); *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, at 273, 287 (Bankr. D. Del. 2017) (finding that the court had statutory authority to consider a plan that included third-party releases as a core proceeding).

### The releases and injunctions are essential<br>components of the proposed settlements and the Plan.

82. The Diocese's ability to successfully provide meaningful recompense for abuse survivors is dependent upon its ability to fund a plan of reorganization with insurance contributions. The proposed settlements are an essential component of the Diocese's forthcoming Plan. Neither the Settling Insurers nor the DOR Entities who are co-insureds on the Subject Policies would have agreed to settle without the releases and injunctions contemplated in the proposed settlements. If the Settling Insurers do not receive the releases and injunctions, they will not voluntarily contribute any amount, let alone $107,250,000 to fund the Trust. If the Non-Debtor DOR Entities do not receive the benefit of the injunctions channeling Survivor Claims against them to the Trust, they will neither voluntarily relinquish their rights to coverage under the Subject Policies nor will they contribute to the additional $40,500,000 infusion which the Plan contemplates will be jointly contributed by the Diocese and the other DOR Entities. There is no other way that the Diocese will be able to raise – at a minimum of expense – $147,750,000 to fund the Trust. Simply put, without the releases and injunctions, there would be no settlement, and no prospect for confirmation of the Plan.

### The releases and injunctions are being given<br>in exchange for good and valuable consideration.

83. The proceeds of the proposed settlements will be paid to the Trust for the benefit of abuse survivors. The Settling Insurers insisted on additional protections, in the form of the releases and injunctions, and have factored the value of that additional protection into the

amounts they are willing to pay to settle the Coverage Action and all other claims by the DOR Entities.

84.     The DOR Entities, as additional insureds, have the right to make claims under the Subject Policies.  The DOR Entities receive the releases and injunctions in exchange for giving up those rights, which include both the right to receive payment of defense costs in the event of a lawsuit and indemnity coverage for judgments obtained against them.  To effectuate a complete policy buy-back as contemplated by the proposed settlements, the buy-back must also include a repurchase of the DOR Entities' insurance rights.  However, the DOR Entities will not release their rights under the Subject Policies without obtaining the protection of a section 105 release and channeling injunction.  Without the participation and agreement of the DOR Entities to sell back their interests in the Subject Policies, the buy-back, from the Settling Insurers' perspective, would be meaningless, because the Settling Insurers would still face exposure because of the coverage provided to all of the non-debtor DOR Entities.

### The releases and injunctions will enable <u>abuse survivors to receive a meaningful distribution.</u>

85.     The proposed settlements are a component of the Plan that, once confirmed, will enable the Diocese to fund the Trust with $147,750,000 for abuse survivors.  Absent the releases and injunctions, there would be no settlements.  Consummation of the settlements and payment by the Settling Insurers of $107,250,000 will therefore enable the Diocese to make a meaningful distribution to abuse survivors in an amount that would otherwise not be available absent a very favorable litigation outcome following a protracted and costly adversary proceeding.

**F.**     **The proposed settlements are not a *sub rosa* plan.**

86.     In *Lionel*, the Second Circuit held that a debtor in possession may enter into transactions outside the ordinary course of business pursuant to section 363 of the Bankruptcy

33

Code if there is an articulated business justification for such transaction. *In re Lionel Corp.*, 722 F.2d 1063, 1069-70 (2d Cir. 1983). "A debtor cannot, however, enter into a transaction that 'would amount to a *sub rosa* plan of reorganization' or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization." *In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) (quoting *Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007). "If, however, the transaction has 'a proper business justification' which has the potential to lead toward confirmation of a plan and is not to evade the plan confirmation process, the transaction may be authorized." *Id*.

87.     "A settlement constitutes a *sub rosa* plan when the settlement has the effect of dictating the terms of a prospective chapter 11 plan." *In re Capmark Financial Group Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010). "To be found to dictate the terms of a plan, the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote." *Id*. (approving settlement with secured lenders involving "cash for collateral" swap over objection by unsecured creditor committee that debtor possessed valid causes of action against lenders and had settled too cheaply where pre-confirmation approval of settlement did not deprive any party of the critical protections of a chapter 11 confirmation process).[14]     Conversely, where a settlement does not (i) dispose of all claims against the debtor, (ii) restrict creditors' rights to vote as they deem fit on a chapter 11 plan, or (iii) dispose of virtually all of a debtor's assets, it does not constitute an impermissible *sub rosa* plan. *Official Comm. of Unsecured Creditors v.*

---

[14] *Capmark* also held that a settlement agreement is not a *sub rosa* plan merely because it provides for the exchange of mutual releases. The *Capmark* court recognized that "[r]eleases are a necessary and expected term in a settlement agreement, as the point of settlement is to finally and fully resolve outstanding disputes between the parties. Without such releases, a settlement would be ineffective." 438 F.3d at 514. Similarly here, the only way to effectuate a full buyback of the Settling Insurers' policies is to have every insured DOR Entity agree to relinquish their equal rights under such policies. The only practical way to achieve such a result is to provide each of the non-debtor DOR Entities with releases and channeling injunctions in exchange for the substantial contribution of their insurance rights.

*Cajun Electric Power Cooperative, Inc. (In re Cajun Electric Power Cooperative)*, 119 F.3d 349, 355 (5th Cir. 1997).

88.     Even large and important settlements may be approved prior to confirmation of a plan where such settlements do not dispose of or release the claims of creditors or restrict their rights to vote on an eventual plan of reorganization.  *In re Tower Automotive Inc.*, 241 F.R.D. 162, 169 (S.D.N.Y. 2006).  For example, in *Tower Automotive*, the court approved a settlement agreement that provided for the use of a substantial portion of the debtor's unencumbered assets to fund payment of at least 20% of retirement obligations that constituted more than half of all unsecured claims against the debtor, reasoning that such payment would "resolve a necessary pre-condition to any proposed plan of reorganization" and was therefore "essential to, and the first step in facilitating, an ultimate plan of reorganization." *Id*.  at 169-70.  Similarly here, resolving the insurance contribution to be made by the Settling Insurers is an essential precondition to the Diocese's Plan.

89.     Moreover, where a settlement will be implemented only "in accordance with a confirmed chapter 11 plan" and parties in interest are provided with a full opportunity to vote on such plan, the settlement does not constitute a *sub rosa* plan.  *In re Nortel Networks, Inc.*, 522 B.R. 491, 508-09 (Bankr. D. Del. 2014).  Here, the sale of the Subject Policies and the releases and channeling injunctions in favor of the Settling Insurers and the DOR Entities are all expressly made contingent upon the confirmation of the Plan, which will be subject to all applicable confirmation standards under section 1129 of the Bankruptcy Code.  Accordingly, approval of the settlements will not impair the rights of abuse claimants, or any other constituency, to raise any issues in connection with the confirmation of the Plan and the proposed settlements cannot be a *sub rosa* plan.

14010478.8

## NOTICE

90.     Notice of this Motion will be given to (i) the Office of the United States Trustee for the Western District of New York; (ii) counsel for the Committee; (iii) counsel for each of the defendants in the Adversary Proceeding; (iv) all required governmental agencies; (v) all parties who have formally appeared in this Chapter 11 Case and requested notice in accordance with Rule 2002 of the Federal Rules of Bankruptcy Procedure; (vi) all persons, or their attorneys, known to the Diocese or the DOR Entities to assert Survivor Claims against the Diocese and/or any of the DOR Entities; (vii) the Secretary of the Department of Health and Human Services; (viii) the Centers for Medicare and Medicaid Services; (ix) the United States Attorney for the Western District of New York; (x) all known creditors of the Diocese; and (xi) all other persons who are known to the Parties to have asserted any rights under the Subject Policies or whose interests would otherwise reasonably be expected to be affected by the transactions contemplated in the proposed settlement agreements.

91.     In addition, the Diocese will make arrangements for publication notice of the hearing on this Motion to be printed in the national edition of either *The New York Times* or the *USA Today* and in the *Rochester Democrat & Chronicle*. In light of the nature of the relief requested herein, the Diocese respectfully submits that such notice is reasonably calculated under the circumstances to apprise any person who may have an interest in the Subject Policies or whose rights may be affected by the proposed settlements of the pendency of this Motion and that no other or further notice is required or necessary.

## CONCLUSION

92.     The proposed settlements are the culmination of years of mediation facilitated by Judge Zive and independent negotiations between the Parties. The settlements are an important

part of the Diocese's Plan, and their approval will create a pathway to confirmation whereas continued litigation is likely to be expensive and riddled with delay, without any upside guarantee.

93.     In short, the proposed settlements will provide abuse survivors vastly more than the Diocese could have offered when this Chapter 11 Case began and, if approved, will represent a substantial value recovery for the estate.  Accordingly, the Diocese respectfully submits that for the reasons set forth herein, and as will be established in an evidentiary hearing before the Court, the Court should approve the proposed settlements attached hereto.

**WHEREFORE**, the Diocese respectfully requests that the Court enter orders (i) finding that notice of this Motion was adequate under the circumstances; (ii) approving the proposed settlement agreements in their entirety; (iii) authorizing the Diocese to enter into the proposed settlement agreements; and (iv) granting such other and further relief as the Court deems just and proper.

Dated: May 20 , 2022                              BOND, SCHOENECK & KING, PLLC


By:      /s/  Stephen A. Donato
Stephen A. Donato
Charles J. Sullivan
Grayson T. Walter
One Lincoln Center
Syracuse, NY 13202
Telephone: (315) 218-8000
Facsimile:  (315) 218-8100
Emails: sdonato@bsk.com
            csullivan@bsk.com
            gwalter@bsk.com

*Attorneys for The Diocese of Rochester*

14010478.8