UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No.: 19-20905 |
| The Diocese of Rochester, | Chapter 11 |
| Debtor. | |

| | |
|---|---|
| The Diocese of Rochester, | |
| Plaintiff, | |
| | Adversary Proceeding No.: 19-ap-02021 |
| v. | |
| The Continental Insurance Company, Certain Underwriters at Lloyd's, London, Certain London Market Companies, The Dominion Insurance Company Limited, Stronghold Insurance Company Limited, CX Reinsurance Company Limited, Markel International Insurance Company Limited, Tenecom Limited, National Surety Corporation, Interstate Fire & Casualty Company, Colonial Penn Insurance Company, and HDI Global Specialty SE, | |
| Defendants. | |

## **DECLARATION OF JAMES R. MURRAY**

I, James R. Murray, declare as follows:

1.  I am a partner at the law firm Blank Rome LLP, which is Special Insurance Counsel to The Diocese of Rochester ("Diocese") in this case. This Declaration is filed in support of its motion for entry of an order approving the Settlement Agreements and Releases (the "Agreements") between the Diocese and Certain Underwriters at Lloyd's, London and Certain London Market Companies (collectively, "LMI"), Certain Underwriters at Lloyd's,

London and HDI Global Specialty SE f/k/a International Insurance Company of Hannover SE (collectively, "Underwriters"), Interstate Fire & Casualty Company and National Surety Corporation (collectively, "Interstate"), and The Continental Insurance Company, successor by merger to Commercial Insurance Company of Newark, New Jersey and Firemen's Insurance Company of Newark, New Jersey ("Continental" and, together with LMI, the Underwriters, and Interstate, the "Settling Insurers"). *See* Motion [ECF No. 190], *Diocese of Rochester v. Cont'l Ins. Co.* (*In re Diocese of Rochester*), Adversary Proceeding No.: 19-ap-02021 (Bankr. W.D.N.Y.). As detailed in the Agreements, the Settling Insurers will make settlement payments totaling $107.25 million for the benefit of abuse survivors. Specifically, LMI will contribute $16.65 million, the Underwriters will contribute $1.1 million, Interstate will contribute $26 million, and Continental will contribute $63.5 million. In addition, the Agreements include, among other things, a full or partial "buy back" by the Settling Insurers of insurance policies that cover the Diocese free and clear of interests. These "buy backs" and the settlements, including the amount of payment, are contingent on successful confirmation of a plan of reorganization.

2. The United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Court") appointed Blank Rome LLP as Special Insurance Counsel for the Diocese by Order dated November 27, 2019. *See* Order [ECF No. 300], *In re Diocese of Rochester*, Case No.: 19-20905 (Bankr. W.D.N.Y.). I have been personally and directly involved with the insurance coverage litigation and the negotiations that led to the settlement that the Agreements memorialize.

3. On September 12, 2019, the Diocese filed for Chapter 11 bankruptcy. A total of 513 individuals have filed proofs of claim in the bankruptcy, asserting that they were sexually

2

abused by priests and, among other claims, the Diocese was negligent in supervising these priests. The Diocese tendered certain proofs of claims to the Settling Insurers (the "Claims").

4. In the bankruptcy proceedings, the Diocese initiated an adversary action on November 14, 2019 against the Settling Insurers and certain other insurance companies that either sold or are responsible for general liability insurance policies that the Diocese contended covered the Claims.

5. The Settling Insurers contend, for a variety of reasons, some of which are set forth below, that they owe little or no insurance coverage in connection with the Claims. The Diocese disagrees with the Settling Insurers' positions, but given the time and financial resources it would take for the parties to litigate the insurance coverage issues to completion, the risks of litigation, and the potential for appeals to further delay recoveries to the estate, it is in the Diocese's best interest to reach a consensual resolution of the disputes regarding the availability of insurance coverage for the Claims.

6. On March 10, 2020, the Bankruptcy Court appointed Judge Gregg W. Zive to serve as mediator. *See* Order Directing Mediation and Appointing Mediator [ECF No. 39]. Since then, the Diocese and the Settling Insurers have engaged in extensive mediation efforts regarding the coverage available for the Claims.

7. The Diocese contended that Continental is responsible for certain primary and excess general liability insurance policies with policy periods from January 1, 1943 to June 1, 1977. The Diocese also contended LMI is responsible for certain primary and excess general liability insurance policies with policy periods from June 1, 1977 to July 1, 1988, while Interstate is responsible for certain excess policies with policy periods from September 1, 1978 to July 1, 1986. The Diocese further contended that the Underwriters are responsible for certain primary

3

14080507.4
Case 2-19-02021-PRW, Doc 191, Filed 05/20/22, Entered 05/20/22 15:55:47, Description: Main Document , Page 3 of 7

and excess insurance policies providing sexual misconduct coverage with policy periods (as relevant here) from July 1, 2018 to July 1, 2021. Including late-filed proofs of claim, the Diocese has tendered 173 Claims to LMI, 152 Claims to Interstate, 360 Claims to Continental, and 48 Claims to the Underwriters.

8. The Diocese contended that the foregoing policies provided coverage for those Claims implicating the Settling Insurers' policy periods. For example, the Diocese contended that (1) each act of abuse triggered a separate per occurrence limit, (2) the per occurrence limits were annualized, and (3) the self insured retentions ("SIRs") are subject to aggregate limits. Moreover, the Diocese contended that no exclusions or other limitations in the policies applied to preclude coverage.

9. The Settling Insurers acknowledged the relevant policies, but nevertheless asserted numerous coverage defenses in their coverage position letters. For example, LMI and Interstate argued that the Diocese was responsible for paying an SIR with respect to each occurrence. As the SIR is $75,000 each occurrence during the periods from June 1, 1977 to July 1, 1986, LMI and Interstate therefore contended that the Diocese would potentially have to pay tens of millions of dollars to satisfy the SIRs. LMI also asserted that certain policies with policy periods from July 1, 1986 to July 1, 1988 provided claims made coverage and would not be implicated because the claims at issue were not made during those periods. LMI also contended that those policies contained sexual misconduct exclusions. In addition, LMI contended that their liability is reduced because their subscription to certain policies is only 80% or 90%, and some insurers that subscribed to the LMI policies are insolvent. The Settling Insurers also disputed whether certain Claims alleged abuse during their policy periods (or, in the case of the

4

Underwriters, after the Continuity Date) and that a significant number of Claims in their periods were of low or no value or filed after the proof of claim deadline.

10. The Settling Insurers also contended that coverage for certain Claims was barred in whole or in part by certain terms, conditions, limitations, and exclusions under some or all the policies. For instance, LMI and Interstate asserted that the Diocese had the burden of proving, among other things, that the abuse was caused by an "occurrence" under the policies. According to LMI and Interstate, certain Claims alleged injuries that were not caused by an "occurrence" to the extent the Diocese might have been aware of the alleged perpetrator's propensity for or history of molesting children prior to or during the alleged abuse, and failed to take appropriate action in response. Additionally, the Underwriters asserted that the Diocese had prior notice of certain Claims or alleged perpetrators, therefore barring coverage pursuant to policy exclusions. The Diocese disputed the Settling Insurers' contentions. Nonetheless, if the Settling Insurers' contentions were upheld, there could be a reduction in any recovery by the Diocese, consequently limiting any recovery by the claimants.

11. The Agreements between the Diocese and the Settling Insurers benefit the claimants. If no settlements had been reached with the Settling Insurers and litigation ensued, the Diocese faced a risk that the Bankruptcy Court would ultimately rule against the Diocese on one or more of the disputed issues, any one of which could limit coverage, potentially for numerous claims. Even if the Bankruptcy Court ruled in the Diocese's favor on one or more of the issues, the Diocese would likely have had to go to trial to resolve disputed factual issues, such as whether the Claims alleged abuse that was sufficiently accidental from the perspective of the Diocese to constitute an "occurrence" covered by the policies, or whether the Diocese had prior knowledge of a given Claim or alleged perpetrator. At trial, the Settling Insurers may have

5

attempted to take the position that no "occurrence" existed or exclusions barred coverage and thus the Diocese was not entitled to any coverage, by contending that, among other things, the Diocese was allegedly aware that priests sexually abused minors, allowed abusers to return from treatment to their parishes without informing the parishioners, and did not supervise or have any policies or procedures regarding the supervision of priests.

12. The trial would likely have been followed by post-trial motions and appeals. On appeal, the District Court could have reversed any rulings by the Bankruptcy Court in favor of the Diocese. Any potential appeal to the Second Circuit would add further delay and uncertainty. In addition to prolonging the final determination of the coverage issues possibly for years, with no certainty that the Diocese would prevail, the Diocese would continue to incur costs throughout the process, which would erode the value of the Diocese's estate and the resources available from the Diocese's estate to pay the Claims. Meanwhile, the Settling Insurers' ability to pay claims could decrease over time if, for example, additional insurers that subscribe to the LMI policies become insolvent.

13. In light of (1) the costs to the Diocese's estate to litigate its coverage claims against the Settling Insurers, (2) the time it will take to obtain a final determination of the Diocese's rights and claims under the insurance policies, (3) the risk that the Diocese may not prevail in litigation of the issues, (4) the likelihood that the losing party would appeal any judgment, thus delaying ultimate resolution of the dispute potentially for years, and (5) the desire to obtain the maximum value promptly from the Settling Insurers under the policies to use toward the resolution of Claims, the Diocese determined that it is in the best interest of its estate and its creditors to reach a negotiated resolution of the dispute between the Diocese and the Settling Insurers.

6

14. In addition to the settlement amounts from the Settling Insurers, other insurers are implicated by proofs of claims. For example, the Diocese recently obtained a policy sold by First State Insurance Company, which may provide additional coverage for the Claims.

15. Given the above factors, including the risks of litigation and the interests of the creditors, I believe that the Agreements providing a total of $107.25 million are within the range of reasonableness and should be approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: May 20, 2022

By: _____

7

14080507.4
Case 2-19-02021-PRW, Doc 191, Filed 05/20/22, Entered 05/20/22 15:55:47, Description: Main Document , Page 7 of 7