## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No.: 19-20905 |
| The Diocese of Rochester, | Chapter 11 |
| Debtor. | |

| | |
|---|---|
| The Diocese of Rochester, | |
| Plaintiff, | |
| | Adversary Proceeding |
| | No.: 19-ap-02021 |
| v. | |
| The Continental Insurance Company, Certain Underwriters at Lloyd's, London, Certain London Market Companies, The Dominion Insurance Company Limited, Stronghold Insurance Company Limited, CX Reinsurance Company Limited, Markel International Insurance Company Limited, Tenecom Limited, National Surety Corporation, Interstate Fire & Casualty Company, Colonial Penn Insurance Company, and HDI Global Specialty SE, | |
| Defendants. | |

### REPLY IN SUPPORT OF MOTION TO APPROVE PROPOSED INSURANCE SETTLEMENTS TO FUND SURVIVOR COMPENSATION TRUST

The Diocese of Rochester, (the "Diocese"), by and through its undersigned counsel, hereby respectfully submits this reply to the objection filed by the Official Committee of Unsecured Creditors (the "Committee") [Main Case Docket No. 1555] and the joinders to that objection filed by several attorneys claiming to represent certain unspecified sexual abuse claimants [Main Case Docket Nos. 1559, 1561 and 1564] to the Diocese's *Motion to Approve Proposed Insurance Settlements to Fund Survivor Compensation Trust* [Main Case Docket No.

1538] (the "Motion").[1]   As and for its reply, and in support of this Motion, the Diocese respectfully represents as follows:

## I.     The Motion is ripe for the Court's consideration and the proposed settlement agreements do not constitute a *sub rosa* plan

1.     The Committee argues that the Motion is premature, and that the proposed settlement agreements constitute an impermissible *sub rosa* plan.  The Committee is wrong. Numerous decisions, including controlling Second Circuit precedent, make it clear that bankruptcy courts can, and often do, approve pre-plan settlement agreements that are made expressly conditional upon the subsequent confirmation of a chapter 11 plan incorporating and effectuating the settlement, and that such arrangements are not *sub rosa* plans.

2.     A motion under Bankruptcy Rule 9019 is not rendered unripe or premature by the fact that the settlement for which the debtor seeks approval may include conditions to its effectiveness such as the confirmation of a plan.  *See In re Bennett Funding Group, Inc.*, 439 F.3d 155 (2d Cir. 2006) (permitting settlement where condition subsequent involved second court's approval); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285 (2d Cir. 1992) (approving class action settlement subject to plan confirmation); *In re Dewey & LeBoeuf LLP*, 478 B.R. 627 (Bankr. S.D.N.Y. 2012) (approving settlements subject to plan confirmation).

3.     Furthermore, a settlement agreement may contemplate, or even be conditioned upon, the approval of additional terms to be effectuated through a future plan of reorganization, without being a *sub rosa* plan.  The Committee asserts that the proposed settlement agreements, viewed collectively, constitute a *sub rosa* plan without recognizing substantial (and controlling) law favoring the settlement of disputed claims as a means to "help clear a path for the efficient administration of the bankrupt estate, including any eventual plan of reorganization."  *Motorola,*

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

14429290.2

*Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007).

4.     In *Lionel*, the Second Circuit held that a debtor in possession may enter into transactions outside the ordinary course of business pursuant to section 363 of the Bankruptcy Code if there is an articulated business justification for such transaction. *In re Lionel Corp.*, 722 F.2d 1063, 1069-70 (2d Cir. 1983). "A debtor cannot, however, enter into a transaction that 'would amount to a *sub rosa* plan of reorganization' or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization." *In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) (quoting *Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007). "If, however, the transaction has 'a proper business justification' which has the potential to lead toward confirmation of a plan and is not to evade the plan confirmation process, the transaction may be authorized." *Id*.

5.     "A settlement constitutes a *sub rosa* plan when the settlement has the effect of dictating the terms of a prospective chapter 11 plan." *In re Capmark Financial Group Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010) citing *In re Tower Automotive Inc.*, 241 F.R.D. 162, 168 (S.D.N.Y. 2006). "To be found to dictate the terms of a plan however, the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote." *Id.* (approving settlement over objection by unsecured creditor committee that debtor had settled too cheaply where pre-confirmation approval of settlement did not deprive any party of the critical protections of a chapter 11 confirmation process).[2] Conversely, where a settlement does not (i)

---

[2] *Capmark* also held that a settlement agreement is not a *sub rosa* plan merely because it provides for the exchange of mutual releases. The *Capmark* court recognized that "[r]eleases are a necessary and expected term in a settlement agreement, as the point of settlement is to finally and fully resolve outstanding disputes between the parties. Without such releases, a settlement would be ineffective." 438 F.3d at 514. Similarly here, the only way to effectuate a full buyback of the Settling Insurers' policies is to have every insured DOR Entity agree to relinquish their equal rights under such policies. The only practical way to achieve such a result is to provide each of the non-

dispose of all claims against the debtor, (ii) restrict creditors' rights to vote as they deem fit on a chapter 11 plan, or (iii) dispose of virtually all of a debtor's assets, it does not constitute an impermissible *sub rosa* plan. *Official Comm. of Unsecured Creditors v. Cajun Electric Power Cooperative, Inc. (In re Cajun Electric Power Cooperative)*, 119 F.3d 349, 355 (5th Cir. 1997). The Diocese respectfully submits that the proposed settlement agreements do not run afoul of any of these tripwires.

6.    Even large and important settlements may be approved prior to confirmation of a plan where such settlements do not dispose of or release the claims of creditors or restrict their rights to vote on an eventual plan of reorganization. *In re Tower Automotive Inc.*, 241 F.R.D. 162, 169 (S.D.N.Y. 2006). As the Second Circuit has held, the fact a transaction might have an "inevitable and enormous influence on any eventual plan of reorganization or liquidation" does not make it a *sub rosa* plan where "it does not specifically 'dictate,' or 'arrange' *ex ante*, by contract, the terms of any subsequent plan." *In re Chrysler LLC*, 576 F.3d 108, 117 n.9 (2d Cir. 2009), *cert. granted, judgment vacated on other grounds sub nom. Indiana State Police Pension Tr. v. Chrysler LLC*, 558 U.S. 1087, 130 S. Ct. 1015, 175 L. Ed. 2d 614 (2009).

> The sale of assets is permissible under § 363(b); and it is elementary that the more assets sold that way, the less will be left for a plan of reorganization, or for liquidation. But the size of the transaction, and the residuum of corporate assets, is, under our precedent, just one consideration for the exercise of discretion by the bankruptcy judge(s), along with an open-ended list of other salient factors.

*Id*. at 117 (citing *Lionel*, 722 F.2d at 1071). While the proposed settlement agreements may be conditioned upon confirmation of a plan with specific features, nothing in the agreements

---

debtor DOR Entities with releases and channeling injunctions in exchange for the substantial contribution of their insurance rights.

14429290.2

mandates that such a plan be confirmed or impairs any creditor's right to vote. Instead, failure to confirm such a plan merely provides the parties with a termination right.

7.     Courts have approved settlement agreements conditioned upon the subsequent confirmation of a plan with specific required features while simultaneously overruling *sub rosa* plan arguments. *In re Dewey & LeBoeuf LLP*, 478 B.R. 627 (Bankr. S.D.N.Y. 2012) presents an illustrative case study. In *Dewey*, the debtor law firm sought approval of approximately 400 agreements in settlement of potential claims it could have asserted against former partners based upon a number of theories, including, *inter alia*, claims for over-distributions, fraudulent conveyances, preferences, unpaid capital contributions, tort claims for mismanagement and unfinished business claims. *Id.* at 632. The agreements contemplated a payment by the former partners in exchange for a general release from the estate, and the debtor was also obligated to obtain through its plan an injunction protecting the settling partners. *Id.* at 633. An official committee of former partners and an ad hoc committee of retired partners objected to the proposed settlements arguing, among other things, that the settlements were premature (because they were conditioned upon effectuation through subsequent confirmation of a plan) and constituted a *sub rosa* plan. In connection with applying the *Iridium* factors to determine that the settlements were in the best interest of the debtor's estate, the *Dewey* court rejected the arguments raised by the objecting committees that the settlements were premature or constituted *sub rosa* plans. Specifically, the *Dewey* court held:

> The [settlement agreements] raise an actual controversy; the fact that the effectiveness of the settlement includes a condition subsequent – that the plan be confirmed – does not alter this conclusion. While it is true that a *sub rosa* plan is impermissible because it allows a debtor to circumvent the requirements of chapter 11 plan of reorganization, such is not the case here. The [settlement agreements] settle potential claims of the estate and the

5

> Participating Partners; they do not determine rules for distribution or alter any other requirements to confirm the chapter 11 plan.

*Id.* at 642. The *Dewey* court went on to hold that:

> Nothing about this exchange of releases is problematic. The releases are reasonable and necessary to accomplish the purposes of the [settlement agreements], and will ultimately benefit creditors and the estate.

*Id.* at 644. Similarly, in *Global Vision Products*, the court found that an undertaking in a settlement agreement that a trustee propose a plan with specific subordination features did not constitute a *sub rosa* plan because the settlement agreement did not restrict any rights afforded to creditors under the Bankruptcy Code, such as the right to vote on the proposed plan or to propose their own plan, nor did it mandate such subordination. *In re Global Vision Products, Inc.*, 2009 WL 2170253 at *7 (S.D.N.Y. July 14, 2009).

8. Moreover, the fact that a settlement agreement is conditioned upon plan confirmation provides further support that it is not in fact a *sub rosa* plan. *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285 (2d Cir. 1992) (approving settlement agreement that did not "lock up" the terms of the plan because the settlement was contingent on confirmation and creditors that were not a party to the settlement could object to the plan notwithstanding approval of the settlement); *see also In re Delta Air Lines, Inc.*, 370 B.R. 537, 551 (Bankr. S.D.N.Y. 2007) (recognizing that estate claims and causes of action are routinely negotiated, settled and approved under Bankruptcy Rule 9019 as a building block to make progress toward a plan without invoking the procedures applicable to the plan approval process and noting that, as a practical matter, provision making settlement conditioned on confirmation of the Debtor's plan meant that the settlement would be subjected to the Bankruptcy Code procedures for plan approval); *In re Nortel Networks, Inc.*, 522 B.R. 491, 508-09 (Bankr. D. Del. 2014) (rejecting *sub rosa* plan argument where settlement funds would only be paid in accordance with a

confirmed chapter 11 plan and where all parties in interest would be provided a full opportunity to vote on the plan).

9.　　　Here, the transactions contemplated by the proposed settlement agreements are all expressly made contingent upon the confirmation of a chapter 11 plan, which will be subject to all applicable confirmation standards under section 1129 of the Bankruptcy Code. Accordingly, approval of the proposed agreements will not impair the rights of abuse claimants, or any other constituency, to raise any issues in connection with the confirmation of a chapter 11 plan and the proposed agreements cannot be a *sub rosa* plan.

## II.　　The Committee understates the litigation risk inherent in the Diocese's insurance coverage action

10.　　　The Committee contends that the Diocese "overstates" the Settling Insurers' coverage defenses because in fact the Diocese has "a high likelihood of success" against the insurers. The Committee's position is unrealistic. It also ignores the complexity, cost, and delay associated with litigation that would be necessary to resolve such defenses.

Lack of underlying tort liability

11.　　　First and foremost, underlying all of the Committee's arguments about the value of insurance in this case is an assumption that abuse claimants can successfully establish that the Diocese and other DOR Entities are liable to them in tort. The Diocese has compassion for the injuries suffered by all survivors. However, in some cases claimants may not even be able to produce the threshold evidence that they were abused and suffered an injury. Even in the cases where where that much can be proved, it is far from certain (and the Diocese and DOR Entities strongly contest) that claimants can establish a legal duty and a breach of said duty giving rise to tort liability.

14429290.2

12.     Contemporaneously with the filing of this reply, the Diocese is filing objections to 68 claims which assert abuse by perpetrators over whom the Diocese had no supervision or control.  While the Committee presents a number of arguments as to how the Diocese might conceivably be held liable for abuse perpetrated by members of religious orders and other non-diocesan individuals under certain speculative factual circumstances, the Diocese respectfully submits that the evidence will show there is in fact no liability for these claims.[3]  Moreover, the Committee, likely cognizant that many of the claims asserted against the Diocese suffer from significant legal and/or evidentiary infirmities, simply omits from its objection any discussion of the challenges that claimants will need to overcome in order to satisfy their affirmative burden of proving liability against the Diocese and other DOR Entities before any insurance coverage could conceivably be available.  To date, the Diocese has refrained from challenging the veracity of any allegations asserted by abuse claimants, however, the Diocese reserves the right to assert additional objections to claims on any valid basis.  The Diocese also anticipates that certain Settling Insurers will file their own claim objections challenging the Diocese's underlying tort liability to many abuse claimants.

13.     The Diocese respectfully observes that, to the extent legal or factual impediments prevent claimants from establishing any underlying tort liability, the Settling Insurers would have no obligation to provide any insurance coverage for such claims and the mirage of "billions" in potential insurance coverage the Committee is chasing will quickly evaporate.

Number of occurrences

14.     The Committee posits that the Diocese's policies provide "massive amounts" of insurance because New York law treats each incident of abuse as a separate occurrence

---

[3] Moreover, the Committee appears to conflate the religious duties and functions of the Bishop and the juridic person of the Diocese of Rochester under the Church's canonical doctrine with civil law tort concepts applicable to the Diocese as an incorporated entity under New York law.

14429290.2

triggering a separate per occurrence limit of coverage. *See* Obj. ¶ 29 (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. The Roman Catholic Diocese of Brooklyn,* 2017 WL 748834, at *7 (N.Y. Sup. Ct. Feb. 27, 2017) & *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 21 N.Y.3d 139, 149, 991 N.E.2d 666, 672 (2013)). Yet even the Committee's case law acknowledges that some insurance policies may have language that calls for grouping of occurrences, thus limiting the per occurrence limits available. *See, e.g.*, *Roman Catholic Diocese of Brooklyn*, 21 N.Y.3d at 152 ("there is no language within National Union's policies indicating an intent to aggregate the sexual abuse into a single occurrence"). This is not an academic issue. The Settling Insurers have reserved their rights relating to the number of occurrences, and may attempt to distinguish the Committee's cases based on policy language. Given the stakes associated with the number of occurrences, one or more Settling Insurers will likely argue that the terms of their policies call for grouping of occurrences, and, if necessary, litigate this issue through appeal. Because this issue impacts an insurers' obligation with respect to every single claim for which it is responsible, the litigation of this issue would substantially delay any resolution and payment to survivors.[4]

The "expected or intended" defense

15. The Committee contends that the Settling Insurers' expected or intended defense should be given "little, if any" weight because there is no evidence that the Diocese intended to cause injury to survivors. Obj. ¶ 36. In making this assertion, the Committee assumes that because claimants merely allege that the Diocese was negligent that the expected or intended defense is off the table. *Id.* ¶¶ 37, 40. That is naïve, to say the least. The duty to indemnify (i.e.,

---

[4] The Committee asserts it is settled law that payment of a self-insured retention is not a condition precedent to an insolvent insured's recovery. Obj. ¶ 35. However, the Committee appears to have mis-cited LMI's alleged concession in the Diocese of Rockville Centre, New York matter. The Diocese therefore cannot evaluate any impact on the likelihood of success on this issue. Regardless, the SIRs further discount LMI's contribution, even if the Diocese is relieved of the obligation to satisfy the retention.

9

payment of settlements and judgments)—and the "expected or intended defense"—turns on the facts, not allegations in the pleadings. *See Axis Surplus Ins. Co. v. GTJ Co.*, 33 N.Y.S.3d 187, 188 (1st Dep't 2016); *Servidone Const. Corp. v. Sec. Ins. Co. of Hartford*, 64 N.Y.2d 419, 424 (1985) ("The duty to defend is measured against the allegations of pleadings but the duty to pay is determined by the actual basis for the insured's liability to a third person.").

16. Consequently, the Settling Insurers will focus on evidence bearing on what the Diocese may have known about the propensity for each alleged perpetrator to engage in sexual misconduct, when the Diocese knew it, and what remedial measures the Diocese took in response. Insurers have successfully established the expected or intended defense against other dioceses. For example, in *Diocese of Winona v. Interstate Fire & Casualty Co.*, 89 F.3d 1386 (8th Cir. 1996), the Eight Circuit affirmed a finding that the Diocese of Winona expected or intended abuse by a priest. The Committee takes pains to distinguish this case on the ground that it applied an objective standard rather than a subjective standard. But it overlooks that the court found on the facts before it that the Diocese of Winona had subjective knowledge of the priest's (Adamson) tendency for sexual misconduct:

> The Diocese knew of Adamson's sexual abuse of boys over fifteen years. The Diocese knew it was recurring. The Diocese knew treatment was ineffective. The Diocese knew Adamson could not control himself. The Diocese knew that he had molested boys in each and every parish in which he served, yet allowed Adamson to be placed in the Archdiocese in situations where he could continue to abuse.

*Id.*, 89 F.3d at 1394.

17. The Committee recently opposed the Diocese's request to stay state court litigation against non-debtor DOR Entities with the hope and expectation that ongoing litigation would "change the circumstances of a negotiation" on the Diocese's plan of reorganization. *See* April 27, 2022 Hr'g Tr. [Docket No. 1505] at 57:12-13. Moreover, counsel for a large number

of abuse claimants confirmed to the Court that abuse claimants would be coordinating their state court litigation activities through the Committee:

> THE COURT: You're welcome. Mr. Anderson, let me ask you another question while I have you.
>
> If I'm hearing you correctly, it sounds like there's a great deal of coordination among state court counsel, many, most of whom have been involved in these type of cases for many years and Mr. Scharf is Creditors Committee counsel. The papers -- but the Diocese suggests that I should view this, if I don't grant the relief, as 458 survivors scurrying off without any coordination to have their cases heard and a race to the courthouse.
>
> It sounds, based on what you're saying, is that that isn't likely to happen. That if I don't grant the relief, that what would happen would be a more coordinated effort among counsel addressing these to the state courts or am I misunderstanding?
>
> MR. ANDERSON: Well, let me -- I think I can answer this question by saying two things.
>
> One is what Donato says is absolutely incorrect because he's never been through this before and he doesn't know how it works and how we work.
>
> And the second part of that answer is we always as state court counsel here and in all the other cases to which we refer in the past, always in full coordination, full cooperation and with Committee counsel. And it is there that we create efficiencies, create equities and develop a resolution ultimately on behalf of all the survivors.
>
> But it cannot be done unless it's with and through Committee counsel with whom we have worked for so long, and, of course, that speaks to the argument. You already heard about making sure they have standing here and now and moving forward to get this thing done.

*Id*. at 82:16-83:21.

18. The Committee and state court counsel have undoubtedly selected the claims they plan to prioritize in litigation with the aim of securing high jury awards. The most potent evidence that the plaintiffs will seek to introduce in those cases—evidence that the Diocese and

DOR Entities had subjective knowledge—is precisely the same evidence that the insurers may use to support their expected or intended defense. For example, the plaintiffs will try to prove that the Bishop and other leaders of the DOR Entities knew of a given priest's propensities and moved him from one parish to another, because this is the type of evidence that the plaintiffs expect will generate large verdicts. Insurers will likely seize upon the same evidence to attempt to convince a jury in an ensuing coverage action that the Diocese and DOR Entities expected or intended injury.

19. Separate from the evidence plaintiffs will themselves attempt to introduce, the insurers would be entitled to take discovery into the merits of the expected or intended defense, and will no doubt follow a no-stone-unturned approach. Expected or intended issues are fact-specific and involve significant expense and delay to litigate. As the Committee acknowledged, the "expected or intended" defense may be "applied on a claim by claim basis." Obj. ¶ 36. With several hundred claimants, it may take years to complete the necessary discovery. In addition to fact discovery, expert discovery may be needed. *See Allstate Ins. Co. v. Zuk,* 78 N.Y.2d 41, 46 (1991) ("whether a result is reasonably expected should be gauged as of the time and circumstances of the conduct engaged in by the particular actors, not attributed in hindsight"). Litigating this issue is likely to be time-consuming and costly, regardless of whether the Diocese is ultimately successful in some or most instances.

<u>Timely notice</u>

20. The Committee contends that the Diocese provided timely notice, including based on a reasonable belief of non-liability. Obj. ¶ 41. The insurers may not agree and have reserved their rights on this issue. The insurers may contend that the Diocese had a duty to provide notice of occurrences of sexual misconduct prior to the CVA window. This is because insurance

12

policies typically require policyholders to provide notice of occurrences as well as lawsuits. New York has very strict notice requirements. *See Travelers Ins. Co. v. Volmar Const. Co.*, 300 A.D.2d 40, 42, 752 N.Y.S.2d 286, 288 (1st Dep't 2002) ("The notice provision in the policy is a condition precedent to coverage and, absent a valid excuse, the failure to satisfy the notice requirement vitiates the policy."). Although some New York cases have excused late notice on the ground that the policyholder had a reasonable belief in non-liability, the insurers will no doubt contend that the Diocese lacked such a belief. Indeed, the insurers may rely on evidence that claimants themselves introduce for the purpose of attempting to establish that the Diocese breached tort duties to claimants.

21.     If the insurers are successful in securing a ruling that the Diocese failed to provide timely notice, that would potentially set an adverse precedent for any and all occurrences of abuse of which the Diocese had notice prior to the CVA window. In addition, the litigation of the late notice defense could entail lengthy delay. Such delay may be exacerbated by appeals to the District Court and the Court of Appeals, which could add years before the underlying plaintiffs obtain a final determination. Murray Decl., ¶ 12. Meanwhile, extended litigation will erode the value of the Diocese's estate and the resources available to pay claims. *Id.*

22.     In sum, the Committee's position that the Settling Insurers have no potentially valid defenses to coverage is simply untenable.

## III.     The proposed settlement agreements should be approved under the standard approved by the Second Circuit in *Iridium*

23.     The Committee's objection to the Motion invites the Court to conduct a deep dive into the factual and legal merits of both the Diocese's underlying coverage actions against the settling insurers, and the many abuse claims that have been asserted against the Diocese and other DOR Entities. The Committee further suggests that the Court should substitute and rely

upon its own business judgment (or rather, the Committee's) in evaluating whether the settlements are reasonable and adequate. Case law within the Second Circuit makes it clear, however, that Rule 9019 neither requires nor permits such an exercise.

24.     In analyzing the settlement agreements, the responsibility of the bankruptcy judge "is not to decide the numerous questions of law and fact raised . . . but rather to canvass the issues and see whether the settlement falls below the lowest range of reasonableness." *In re W.T. Grant*, 699 F.2d 599, 608 (2d. Cir. 1983) (internal quotations omitted); *In re Nuevo Pueblo, LLC*, 608 Fed. Appx. 40, 42 (2d Cir. 2015). The settlement itself does "not need to be the best that the debtor could have obtained. *In re Adelphia Communications Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005); *accord In re Teletronics Servcs., Inc.*, 46 B.R. 426, 428 (E.D.N.Y. 1984) ("The Bankruptcy Court may also approve the compromise even if it believes that the Trustee ultimately would be successful.") *aff'd* 762 F.2d 185 (2d Cir. 1985).

25.     A bankruptcy court should not substitute its judgment for the debtor's, but only test whether the settlement is reasonable. *See In re Ashford Hotels, Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998); *Depo v. Chase Lincoln First Bank, N.A.*, 77 B.R. 381, 384 (N.D.N.Y. 1987) *aff'd* 863 F.2d 45 (2d Cir. 1988). Though "approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored." *In re Charter Commc'ns*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) (quoting *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009). Moreover, although "the bankruptcy court may consider the objections lodged by parties in interest, such objections are not controlling . . . the bankruptcy court must still make informed and independent judgment." *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006).

14

26.     The Second Circuit has identified seven factors to be applied by bankruptcy courts in evaluating whether a settlement should be approved pursuant to Rule 9019.  Those factors are:

> (1) the balance between the possible litigation success and the settlement's future benefits;
>
> (2) the likelihood of complex and protracted litigation and the consequent inconvenience, expense, and delay;
>
> (3) the interests of creditors, including the relative benefits to each class of creditors and the degree to which they either do not object to or affirmatively support the proposed settlement;
>
> (4) whether other parties in interest support the settlement;
>
> (5) the competency and experience of counsel supporting the settlement and the experience and knowledge of the bankruptcy judge reviewing the settlement;
>
> (6) the nature and breadth of releases to be obtained by officers and directors; and
>
> (7) the extent to which the settlement is the product of arm's length bargaining.

*Iridium*, 478 F.3d at 465.  Each of the *Iridium* factors are discussed in detail in the Motion.

27.     The Committee cites to *Lion Capital* for the proposition that the Court should reject the proposed settlement agreements as being, in the Committee's estimation, not "right and equitable under the circumstances and the law" irrespective of the application of the *Iridium* factors.  Committee Objection, ¶ 20 quoting *In re Lion Capital Grp.*, 49 B.R. 163, 175-76 (Bankr. S.D.N.Y. 1985).  The *Lion Capital* decision was issued by a Southern District bankruptcy court more than two decades prior to the Second Circuit's decision in *Iridium*.  No court within the Second Circuit (or, so far as the Diocese is aware, elsewhere) has suggested that the "right and equitable" standard enunciated in *Lion Capital* requires any additional inquiry, or imposes any additional burden on the proponent of a settlement, beyond consideration of the seven *Iridium* factors.  Nevertheless, even if the Court were to apply the standard articulated in

*Lion Capital*, the proposed settlement agreements should still be approved. The Committee offers up five arguments for its contention that the proposed settlement agreements are not "right and equitable." None are persuasive.

28.     First, the Committee contends that the settlements are not in the best interest of creditors. The only support offered for this position is an assertion that the majority of creditors want the Settling Insurers to pay more and therefore oppose the settlements. While the Committee characterizes more than $107 million in proposed settlement proceeds as "too low" and a "fire sale," its opposition to the Motion is devoid of any suggestion as to what the Committee believes a reasonable settlement amount actually would be in light of both the evidentiary and legal challenges the Diocese would need to overcome in able to prevail in its insurance coverage litigation, as well as the liability defenses the Diocese has with respect to many of the abuse claims. Even if the Court were to accept the Committee's overly optimistic assumptions that the Diocese will prevail on coverage litigation and that abuse claimants can establish liability against the Diocese and DOR Entities, any such outcome is, at best, years away from coming to fruition. When taking into account the possibility (even if remote as the Committee suggests) that the Diocese's litigation efforts would ultimately be unsuccessful – resulting in many millions of dollars of legal fees and years of delay with zero insurance recovery to show for it – the Diocese respectfully submits that it should be clear that the certainty of recovery provided by the proposed settlements is in the best interest of creditors. As the court in *Purdue* observed:

> A settlement is not evaluated in a vacuum, as a wish list. It takes an agreement, which means that if properly negotiated -- and I believe that's clearly the case here -- it generally reflects the underlying strengths and weaknesses of the opposing parties' legal positions and issues of collection, not moral issues or how someone might see moral issues.

16

> It is not enough simply to say "we need more," or "I don't care whether we don't get anything; I'd rather see it all burned up before the Sacklers keep anything." One must focus on the foreseeable consequences of litigation versus settlement.

*In re Purdue Pharma, L.P.*, 633 B.R. 53, 93-4 (Bankr. S.D.N.Y. 2021), *vacated on other grounds* 635 B.R. 26 (S.D.N.Y. 2021), *further appeal pending*. "In evaluating a proposed settlement under Rule 9019, the Court must be careful not to 'expose the Debtor [ ] to the demands of creditors preferring to risk estate assets in a litigation lottery.'" *Geltzer v. Original Soupman Inc. (In re Soup Kitchen Int'l, Inc.)*, 506 B.R. 29, 43 (Bankr. E.D.N.Y. 2014) (quoting *Capmark*, 438 B.R. at 519). Moreover, "[a] debtor may seek approval of a settlement over major creditor objections as long as it carries its burden, ... including [that] the paramount interests of creditors [ ] weighs in favor of settlement." *Id*. at 44 (quoting *Capmark*, 438 B.R. at 519). Accordingly, the Diocese respectfully submits that the Court should disregard the Committee's assertion that the proposed settlements are inadequate merely because the Committee does not agree with the amount being paid by the Settling Insurers. In the absence of demonstrable and convincing proof adduced by the Committee as to the collective value of abuse claims in this case and the likelihood of establishing coverage for such claims, the more than $107 million to be gained from the proposed settlement agreements is undoubtedly in the best interest of creditors.

29. Second, the Committee argues that the Diocese is settling for a low value despite what the Committee characterizes as a high likelihood of success in litigation. The Diocese respectfully submits, as set forth above and as it intends to show at the hearing on the Motion, while there is a strong case for coverage, there are significant legal uncertainties and factual challenges associated with litigating the coverage action to verdict and on appeal. While reasonable minds could differ on the overall strength of the Diocese's litigation claims, the Diocese respectfully submits that under any evaluation there is a greater than negligible risk that

the Settling Insurers may prevail on their coverage defenses, which would effectively leave the Diocese without any insurance coverage. Unless the Committee and abuse claimants are willing to relinquish any claim to other assets of the Diocese and DOR Entities and to rely solely on a speculative insurance recovery after years of litigation to fund payments to survivors, settling uncertain litigation claims for more than $107 million is clearly within the range of reasonable business decisions the Diocese can make and is not unreasonably low when evaluated against the prospect that all coverage could be vitiated if the Settling Insurers prevail on their coverage defenses. As the *Adelphia* court explained: "[g]auging downside risk is a critical aspect of the litigation (and settlement) process. When the consequences of a wrong decision are so huge, it is not unreasonable to hedge against them." *In re Adelphia Commc'ns, Corp.*, 327 B.R. 143, 166-67 (Bankr. S.D.N.Y. 2005), *aff'd*, 337 B.R. 475 (S.D.N.Y. 2006); *see also In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 308 (Bankr. S.D.N.Y. 2015) (quoting *Adelphia* and finding settlement to be in the best interest of creditors, including objecting official committee of unsecured creditors, where pursuit of litigation "could significantly decrease all creditors' recoveries . . . all for a gamble on an increased recovery for unsecured creditors" which the Court had determined to be unlikely.). Similar to the proposed settlements with the Settling Insurers in this case, in *Iridium*, the Second Circuit approved a pre-confirmation comprehensive settlement with the debtor's secured creditors which had the effect of (i) securing a concrete multi-million dollar benefit for the debtor's estate and (ii) avoiding complicated and expensive litigation that would have "gutted" the estate in the event of a loss. 478 F.3d at 458-9, 466 (noting that "[t]he alternative to settling . . . presented too much risk for the Estate . . . If the Estate lost against the Lenders (after years of litigation and paying legal fees), the Estate would be devastated. . . .").

When evaluated against the potential alternative, the settlement agreements cannot realistically be characterized as "low-value."

30.     Third, the Committee argues that the proposed settlement agreements do not avoid the costs and time of litigation because, in the Committee's telling, the Diocese "is merely opting to litigate against survivors instead of insurers." Obj. ¶ 60. This is a false dichotomy. While the Diocese has attempted in good faith to achieve a global resolution through mediation, in the absence of mediation the Diocese would already be litigating on multiple fronts: seeking a determination of coverage against the Settling Insurers while simultaneously contesting liability to claimants in the many instances where the Diocese has valid defenses, and pushing back in all cases against valuation expectations that are untethered from reality. The proposed settlements would fully resolve the dispute between the Diocese and the Settling insurers and thereby avoid the costs and delay of further coverage litigation. Irrespective of any insurance settlement however, the Diocese has a fiduciary duty to provide full and fair compensation (to the extent possible) to those claimants with valid and enforceable claims against the Diocese, and to otherwise preserve its assets for its charitable and humanitarian mission. Given the limited resources available, the Diocese can only faithfully comply with that duty if it contests in good faith any claims where there is no basis for diocesan tort liability and where plaintiffs seek a recovery that is outsized and incongruous with their claimed injuries. The Committee is correct that litigation over claim allowance and valuation may well be costly and protracted. However, it is the Committee's unrealistic expectations of claim recoveries that will dictate the cost and extent of such litigation, not the Diocese's decision to accept a reasonable settlement with its insurers.

14429290.2
Case 2-19-02021-PRW,    Doc 203,    Filed 07/22/22,    Entered 07/22/22 16:31:56,
Description: Main Document , Page 19 of 22

31.     Fourth, the Committee makes only a half-hearted attempt to argue that because the proposed settlements are conditioned upon confirmation of a plan there is no tangible benefit to the estate.  As set forth in detail above, Courts have repeatedly approved settlements and recognized a benefit to the debtor's estate even where the settlement is made conditional upon approval of a subsequent chapter 11 plan.  Contrary to the Committee's contention that the proposed settlements "bind the diocese to a low-value payment . . . leaving all other parties (including the Diocese and its parishes) responsible for making up the difference" and therefore "provide a tangible burden to the estate" (Obj. ¶ 62), in the event the Diocese is unable to confirm a plan containing the terms contemplated in the proposed settlement agreements, the Diocese retains an option to terminate the settlement agreements and to reengage in negotiations and, if necessary, litigation, with the Settling Insurers.  Accordingly, the proposed settlement agreements will either result in more than $107 million flowing into the Diocese's estate or they will be terminated and become a nullity.  They therefore clearly provide a tangible benefit to the estate and, at a minimum, create no burden.

32.     Fifth, and finally, the Committee takes issue with the scope of releases and injunctions contemplated by the proposed settlement agreements.  As set forth in detail in the Motion, these releases and injunctions are necessary and integral elements of any settlement which would require non-debtor DOR Entities to relinquish their insurance rights.   Moreover, this is a plan objection masquerading as an objection to settlement.  There is no request presently before the Court to approve any third-party releases or channeling injunctions, and the Diocese acknowledges that such provisions could only be effectuated through a confirmed chapter 11 plan.  The Diocese further agrees with the Committee that courts have traditionally been more likely to approve third-party releases and to issue channeling injunctions in instances where there

is significant creditor support for such provisions. That said, the Committee's insistence that survivors will reject these necessary elements to any insurance resolution is premature. Shortly after the Motion was filed the Committee sought to reengage with the Diocese and the Settling Insurers in mediation, and the Court recently approved the appointment of Paul Van Osselaer as an additional mediator at the Committee's request and recommendation. There is therefore reason to believe that the parties may yet be able to agree on a consensual plan of reorganization incorporating the third-party releases and channeling injunctions contemplated by the proposed settlement agreements. Furthermore, as set forth above, even if the Diocese is ultimately unable to confirm a plan incorporating the contemplated releases and injunctions (preferably via a consensual plan but if, if necessary, through the Bankruptcy Code's cram down provisions) the settlement agreements are terminable without penalty. Accordingly, the fact that the proposed settlement agreements are conditioned upon the subsequent approval of a plan incorporating releases and injunctions is not a valid basis for the Court to withhold its approval at this time.

WHEREFORE, for the reasons set forth above, and in the Motion, the Diocese respectfully submits that the proposed settlement agreements are fair, reasonable, and in the best interest of the Diocese, its estate, creditors, and other parties in interest, and should be approved.

Dated: July 22, 2022

BOND, SCHOENECK & KING, PLLC

By: _____/s/  Stephen A. Donato_____
Stephen A. Donato
Charles J. Sullivan
Grayson T. Walter
One Lincoln Center
Syracuse, NY 13202
Telephone: (315) 218-8000
Facsimile:  (315) 218-8100
Emails: sdonato@bsk.com
            csullivan@bsk.com
            gwalter@bsk.com

*Attorneys for The Diocese of Rochester*

14429290.2
Case 2-19-02021-PRW,   Doc 203,   Filed 07/22/22,   Entered 07/22/22 16:31:56,
Description: Main Document  , Page 22 of 22